# SLOCUM v. NEW YORK LIFE INSURANCE CO.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 20. Argued April 26, 1912.—Decided April 21, 1913.

Where a life insurance policy plainly provides for payment of the stipulated premium within a specified period of grace after the due day and as plainly excludes any idea of partial payments distributed between the premium dates, the insured gains nothing by giving an agent a portion of the premium in the absence of authority given him by the company to accept it.

One dealing with an agent knowing that his authority is limited and that his acts transcend the limits cannot hold the principal.

Where there is a method for extending payment of premiums which is known to the insured, who also knows that the agent has no power to extend on any other terms, the insured takes nothing by an attempt to extend in a different manner in which an element of substance in the prescribed method is omitted.

The temporary retention by an insurance company of a partial payment of a premium subject to the direction of the insured, *held*, under the circumstances of this case, not to constitute a waiver of full and timely payment.

The Federal courts cannot follow state statutes or practice in opposition to a provision of the Federal Constitution.

While the Seventh Amendment is not applicable to proceedings in the courts of the several States, it is controlling in the Federal courts, and, although under the practice of the State a judgment may be entered on the evidence *non obstante veredicto*, the Federal court may not do so but must order a new trial where the evidence does not sustain the verdict.

The Constitution as originally adopted conferred upon this court appellate jurisdiction both as to law and fact subject to exceptions and regulations prescribed by Congress; but this, as well as the jurisdiction of the other Federal courts, was subsequently restricted by the Seventh Amendment so far as actions at law are concerned.

The power of a Federal court to reëxamine issues of fact tried by a jury

must under the Seventh Amendment be tested by the rules of the common law.

Under the rules of the common law an appellate court may set aside a verdict for error of law in the proceedings and order a new trial but it may not itself determine the issues of fact.

Under the rules of the common law when the court sets aside a verdict there arises the same right of trial by jury as in the first instance.

In the trial by jury, the right to which is secured by the Seventh Amendment, both the court and the jury are essential factors.

Whether the facts are difficult or easy of ascertainment is immaterial, the guaranty of the Seventh Amendment operates to require the issues to be settled by the verdict of a jury unless the right thereto be waived.

The rules of the common law in respect to demurrers to evidence and non-suits furnish no warrant for a Federal court setting aside a verdict and rendering judgment on the evidence without a new trial.

Nothing in *Central Transportation Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, or *Coughran* v. *Bigelow*, 164 U. S. 301, tends to show that a Federal court has power to reëxamine, otherwise than according to the rules of the common law, issues of fact which have been determined by the verdict of a jury.

The terms of the Seventh Amendment and the circumstances of its adoption show that one of its purposes was to require adherence to the rule of the common law that a verdict cannot be disturbed for an error of law occurring on the trial without awarding a new trial.

The right to a new trial on the vacation of a favorable verdict in a case of this nature is a matter of substance and not of form.

In this case the Circuit Court of Appeals properly reversed a judgment on a general verdict for the plaintiff on the ground that the defendant's request for a directed verdict should have been granted by the trial court; but, under the Seventh Amendment, the only course was to order a new trial, and as the judgment of the Circuit Court of Appeals directing a judgment to be entered for defendant notwithstanding the verdict for the plaintiff violated that amendment, the action of the Circuit Court of Appeals is modified by substituting for such direction a direction for a new trial.

177 Fed. Rep. 842, reversed.

THE facts, which involve the construction of a life insurance policy and whether it had expired by reason of non-payment of premium and also the power of the Cir-

cuit Court of Appeals under the Seventh Amendment to reverse a judgment entered on a verdict of a jury and direct judgment for the other party, in conformity with a state practice, are stated in the opinion.

*Mr. George E. Shaw*, with whom *Mr. Daniel B. Henderson* was on the brief, for petitioner.

*Mr. James H. McIntosh*, with whom *Mr. George B. Gordon* was on the brief, for respondent.

Mr. Justice Van Devanter delivered the opinion of the court.

This was an action in the Circuit Court for the Western District of Pennsylvania on a policy of insurance on the life of Alexander W. Slocum. The policy was for $20,000, was an ordinary life contract on the 20-year accumulation plan, was payable to the executors, administrators or assigns of the insured, became effective November 27, 1899, and called for the payment of a premium of $579.60 on each anniversary of that date. It made provision for interest-bearing loans by the company to the insured on terms stated, and also contained the following stipulations:

*"This policy is automatically non-forfeitable from date of issue, as follows:*

"First. If any premium is not duly paid, and if there is no indebtedness to the Company, this policy will be endorsed for the amount of paid-up insurance specified in the table on the second page hereof, on written request therefor within six months from the date to which premiums were duly paid. If no such request is made, the insurance will automatically continue from said date for $20,000 for the term specified in said table and no longer.

"Second. If any premium or interest is not duly paid,

and if there is an indebtedness to the Company, this policy will be endorsed for such amount of paid-up insurance as any excess of the reserve held by the Company over such indebtedness will purchase according to the Company's present published table of single premiums, on written request therefor within six months from the date to which premiums were duly paid. If no such request for paid-up insurance is made, the net amount that would have been payable as a death claim on the date to which premiums were duly paid will automatically continue as term insurance from such date, for such time as said excess of the reserve will purchase according to the Company's present published table of single premiums for term insurance, and no longer.

"*Grace in Payment of Premiums.*—A grace of one month, during which the policy remains in full force, will be allowed in payment of all premiums except the first, subject to an interest charge at the rate of five per cent. per annum.

"*General Provisions.*—(1) Only the President, a Vice-President, the Actuary or the Secretary has power in behalf of the Company to make or modify this or any contract of insurance or to extend the time for paying any premium, and the Company shall not be bound by any promise or representation heretofore or hereafter given by any person other than the above. (2) Premiums are due and payable at the Home Office, unless otherwise agreed in writing, but may be paid to an agent producing receipts signed by one of the above-named officers and countersigned by the agent. If any premium is not paid on or before the day when due, or within the month of grace, the liability of the Company shall be only as hereinbefore provided for such case."

The insured died December 31, 1907, and the action was brought by his executrix. In the plaintiff's statement of claim recovery was sought upon two grounds: First, that

all premiums prior to the one of November 27, 1907, had been duly paid; that the premium of that date had been adequately adjusted on December 27, 1907, the last day of grace, by an agreement between the insured's wife, acting in his behalf, and a duly authorized agent of the company, whereby the wife made, and the agent accepted, a payment of $264.20, which was to carry the policy along until May 27, 1908, and whereby the agent was to accept from the insured a "blue note" for $434.00, payable May 27, 1908, as covering the balance of the premium; and that the company had adopted and confirmed the acts of its agent in that regard; second, that, independently of the adjustment of that premium, the company on November 27, 1907, held a reserve on the policy sufficiently exceeding any indebtedness of the insured to the company to continue the policy in force, under the latter part of the automatic non-forfeiture provision before quoted, beyond the date of his death, and that in consequence of this the policy was in full force when he died. The company entered a plea of non-assumpsit and also filed an affidavit of defense denying the alleged adjustment of the premium of November 27, 1907, as also the existence of any reserve on the policy in excess of the indebtedness of the insured to the company, and otherwise adequately setting up the defenses presently to be noticed. The issues so presented were tried before the court and a jury. At the conclusion of all the evidence, the defendant requested the court to direct a verdict in its favor, which the court declined to do, and the company excepted. A general verdict for the plaintiff, was returned, assessing the recovery at $18,224.02, which sum was ascertained by deducting from the amount of the policy a loan of $2,360.00 from the company to the insured and $434.00, the amount of the intended blue note, and then allowing interest on the remainder from the date when proofs of death were submitted to the company to the date of the verdict.

The company moved for judgment in its favor on the evidence notwithstanding the verdict, but the motion was denied, the company excepting, and judgment was entered for the plaintiff. A bill of exceptions, embodying all the evidence with the rulings and exceptions, was seasonably presented and allowed, and the case was taken on writ of error to the Circuit Court of Appeals, where error was assigned on the refusal to direct a verdict for the defendant and on the denial of the motion for judgment notwithstanding the verdict. That court reversed the judgment with a direction to sustain the latter motion, on the ground that the evidence did not legally admit of the conclusion that the policy was a subsisting contract of insurance at the date of the insured's death. 177 Fed. Rep. 842. A writ of *certiorari* then brought the case here.

The questions now to be considered are, first, whether the Circuit Court of Appeals erred in reversing the judgment, and, second, if it did not err in that regard, whether it should have awarded a new trial instead of directing a judgment for the defendant on the evidence notwithstanding the verdict for the plaintiff.

As a preliminary to the consideration of the first question it may be well to repeat what this court often has said, that when, on the trial of the issues of fact in an action at law before a Federal court and a jury, the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party. *Randall* v. *Baltimore & Ohio Railroad Co.*, 109 U. S. 478; *Delaware &c. Railroad Co.* v. *Converse*, 139 U. S. 469; *Southern Pacific Co.* v. *Pool*, 160 U. S. 438; *Patton* v. *Texas & Pacific Railway Co.*, 179 U. S. 658. The recognized mode of invoking the application of this rule is by preferring, at the conclusion of the evidence, a request for

a directed verdict, and the ruling on such a request is subject to reëxamination and approval or disapproval on writ of error in like circumstances and in like manner as are other rulings in matter of law during the course of the trial.

The case made by the evidence, in that view of it which is most favorable to the plaintiff, was as follows:

The plaintiff's right to recover if the policy was a subsisting contract of insurance at the date of the insured's death, and the latter's compliance with the terms and conditions of the policy other than the payment of the premium of November 27, 1907, were conceded. The month of grace allowed for the payment of that premium expired four days before the insured died. He had been seasonably and regularly notified of the time when the premium would fall due and of the consequences which would follow a default in its payment. But it had not been paid or adjusted, unless a payment or adjustment was effected by the negotiations and transactions presently to be recited.

When the premium fell due the insured was indebted to the company in the sum of $2,360.00 for money theretofore borrowed under the policy, and that sum represented the full amount of the reserve on the policy. If there had been no loan the automatic non-forfeiture provision before quoted and the reserve would have entitled the insured, if he so elected, to a paid-up insurance of $4,000.00 for the full period of his life, and in the absence of such an election would have operated to continue the policy in force for the full sum of $20,000.00 for a period of seven years and seven months, without payment of further premiums. But as the insured had borrowed the full amount of the reserve, there was no excess applicable to a continuance of the insurance in either mode. Thus the policy expired according to its own terms before the death of the insured, unless a pay-

ment or adjustment of the premium of November 27, 1907, was effected in the manner already suggested.

While the policy provided that only the president, a vice-president, the actuary or the secretary of the company had power in its behalf to modify the terms of that or any other policy or to extend the time for paying any premium, the company had qualified this provision by adopting a plan of adjusting the payment of premiums whereby its agents were authorized to accept from an insured less than the full amount in cash if accompanied by a "blue note" for the balance. Notes of this type were distributed by the company and contained stipulations upon which its consent to the adjustment was conditioned and to which the insured would necessarily assent by signing the note. The agent at Pittsburgh, to whom the earlier premiums on this policy were paid, was authorized to make adjustments conformably to this plan, but, like other agents, he could not accept a partial payment or grant an extension of time for the balance unless the blue note was given, nor, so far as appeared, had anything been done which was calculated to engender the belief that he could do so. He repeatedly had accepted payment in cash of part of a premium and extended the time for paying the remainder, but this was done only where the policy holder had given a note of the prescribed type embodying the terms on which the company's assent depended. The practice in this regard was known to the insured and his wife, for they had secured three or four such adjustments in connection with this policy before 1907, the insured being required in each instance to execute such a note.

On the day before the premium of November 27, 1907, fell due, the wife of the insured, acting in his behalf, called at the agent's office and made inquiry respecting the easiest method of adjusting the premium, explaining at the time that the insured was short of ready money. The

agent suggested two possible methods and outlined them upon memoranda which she took away to show to the insured. The first method has no bearing here. "By the other method," as is said in the brief for the plaintiff, "it was represented that if she [meaning the insured] paid $264.20 in cash and gave a blue-note contract for $434.00, payable in six months, the insurance would be continued for a period of six months, and if the note was paid when due, the insurance would be continued for the remainder of the year." The aggregate of these sums represented the premium on the policy and the interest on the loan, settlement of both being essential to a continuance of the policy. On the last day of grace, December 27, 1907, the wife returned to the agent's office with a check for $264.20, payable to her order and by her endorsed to the company. Of what then occurred she testified: "I gave him [the agent] the check for $264.20, and he handed me the blue note and another paper in an envelope, and he said that the note must be signed, and I must return it. I told him Mr. Slocum was ill, and it might be several days before I could send it back, and he said that would be all right, 'Mail it as soon as you can.'" She took the blue note home with her intending to get it signed, but found the insured too ill to give it attention. He died four days later without having signed it. The agent did not give a receipt for the $264.20, nor was one requested. In 1905 that year's premium was adjusted by a partial payment in cash and the giving of a blue note for the balance, and when the adjustment was completed the agent gave a single receipt for both the cash and the note and in the receipt recited the terms upon which the adjustment was made, as was done in the note.

In 1906 the insured had notified the company that his postoffice address was Houston, Texas, and that fact carried matters pertaining to his policy to the company's St. Louis agency. It was from that agency that he

received the notice calling for the payment of the premium of November 27, 1907. On January 6, 1908, the agent at St. Louis, not knowing of the insured's death, wrote to him acknowledging receipt of the check for $264.20 handed to the agent at Pittsburgh (the letter inaccurately stated the amount) and saying: "Pending the return by you of the note contract, properly signed, your remittance is held subject to your order." The check was then deposited in a St. Louis bank to the credit of the company, and the latter carried the amount in a suspense account awaiting directions from the insured.

Subsequently the plaintiff tendered to the company the amount for which the blue note was to have been given, and the company tendered to the plaintiff the amount of the check, both tenders being refused.

The material portion of the agreement set forth in the proposed blue note, which was to have been signed by the insured and returned to the company's agent, is as follows:

"This note is accepted by said Company at the request of the maker, together with One hundred forty-five and 60–100 Dollars [1] in cash, on the following express agreement: That although no part of the premium due on the 27th day of Nov. 1907, under Policy No. 3,011,158 issued by said Company on the life of A. W. Slocum has been paid, the insurance thereunder shall be continued in force until midnight of the due date of said note; that if this note is paid on or before the date it becomes due, such payment, together with said cash, will then be accepted by said Company as payment of said premium, and all rights under said policy shall thereupon be the same as if said premium had been paid when due; that if this note is not paid on or before the day it becomes due, it shall thereupon automatically cease to be a claim against the maker, and

---

[1] The remaining portion of the check represented interest on the loan made under the policy.

said Company shall retain said cash as part compensation for the rights and privileges hereby granted, and all rights under said policy shall be the same as if said cash had not been paid nor this agreement made."

The Circuit Court of Appeals was of opinion that the evidence conclusively established that there was no excess of reserve on the policy applicable to a continuance of the insurance after the premium of November 27, 1907, fell due, and we fully concur in that conclusion. Indeed, its correctness is practically conceded by counsel for the plaintiff. That court also was of opinion that the evidence afforded no basis for a finding that that premium was either paid or adjusted. The accuracy of that conclusion is challenged, but we are constrained to give it our approval for the following reasons:

1. The policy plainly provided for the payment of the stipulated premium annually within the month of grace following the due day, and as plainly excluded any idea that payment could be made in installments distributed through the year. Concededly, there was no payment of the whole of the premium in question, and as a partial payment was not within the contemplation of the policy, nothing was gained by handing to the agent the check for $264.20, unless what he did in that connection operated as a waiver of full and timely payment.

2. One who deals with an agent, knowing that he is clothed with a circumscribed authority and that his act transcends his powers, cannot hold his principal; and this is true whether the agent is a general or a special one, for a principal may limit the authority of one as well as of the other.

3. Under the terms of the policy, as qualified by the practice of the company, the agent was without authority to waive full and timely payment of the premium, save as he could adjust the payment conformably to the blue-note plan. His authority turned upon the giving of the note,

which was a matter of real substance, and not of mere form, as is shown by the terms of the note, before quoted. See *White* v. *New York Life Insurance Co.*, 200 Massachusetts, 510. Without it he could neither accept a partial payment nor extend the time for paying the balance. No note was given, and so no waiver resulted from his acts. The insured and his wife · could not reasonably have understood it otherwise, for they knew the terms of the policy and were familiar with the qualifying practice.

4. There was no evidence that the company itself treated the check as a partial payment or otherwise ratified the agent's acts. Indeed, the only permissible inference from the evidence was to the contrary.

We are accordingly of opinion that the evidence did not admit of a finding that the policy was in force at the time of the insured's death, and therefore that the Circuit Court should have granted the company's request that a verdict in its favor be directed. As that request was denied, the Circuit Court of Appeals did not err in reversing the judgment.

It becomes necessary, therefore, to consider whether that court should have directed a new trial, instead of a judgment on the evidence contrary to the verdict. The latter direction was given conformably to a statute of Pennsylvania, the State in which the Circuit Court was held, and to the practice thereunder in the courts of the State. The statute reads as follows:

"That whenever, upon the trial of any issue, a point requesting binding instructions has been reserved or declined, the party presenting the point may, within the time prescribed for moving for a new trial, or within such other or further time as the court shall allow, move the court to have all the evidence taken upon the trial duly certified and filed so as to become part of the record, and for judgment *non obstante veredicto* upon the whole record; whereupon it shall be the duty of the court, if it does not

grant a new trial, to so certify the evidence, and to enter
such judgment as should have been entered upon that
evidence, at the same time granting to the party against
whom the decision is rendered an exception to the action
of the court in that regard. From the judgment thus
entered either party may appeal to the Supreme or
Superior Court, as in other cases, which shall review the
action of the court below, and enter such judgment as shall
be warranted by the evidence taken in that court." Penn.
Laws 1905, p. 286, c. 198.

The real question is, whether in the direction given by
the Circuit Court of Appeals there was an infraction of the
Seventh Amendment to the Constitution of the United
States, which declares:

"In suits at common law, where the value in controversy
shall exceed twenty dollars, the right of trial by jury shall
be preserved, and no fact tried by a jury shall be other-
wise reëxamined in any Court of the United States, than
according to the rules of the common law."

That what was done may be clearly in mind it is well
to repeat that, while on the trial in the Circuit Court the
jury returned a general verdict for the plaintiff, the
Circuit Court of Appeals on an examination of the evidence
concluded that it was not sufficient to sustain the verdict,
and on that ground directed a judgment for the defendant.
In other words, the Circuit Court of Appeals directed
a judgment for one party when the verdict was for the
other, and did this on the theory, not that the judgment
was required by the state of the pleadings, but that it was
warranted by the evidence. It will be perceived, therefore,
that the court, although practically setting the verdict
aside, did not order a new trial, but assumed to pass
finally upon the issues of fact presented by the pleadings
and to direct a judgment accordingly. If this was an
infraction of the Seventh Amendment it matters not that
it was in conformity with the state statute, or with the

practice thereunder in the courts of the State, for neither the statute nor the practice could be followed in opposition to the Amendment, which, although not applicable to proceedings in the courts of the several States, is controlling in the Federal courts.

The Constitution of the United States, as originally adopted, conferred upon this court, by Article III, § 2, "appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make;" but this and the absence of any provision respecting the mode of trial in civil actions were so generally regarded as endangering the right of trial by jury as existing at common law and evoked so much criticism on that ground that the first Congress proposed to the legislatures of the several States the Seventh Amendment, which was promptly ratified. 1 Stat. 21, 97; Story on the Constitution, §§ 1763, 1768.

The adjudged cases dealing with the origin, scope and effect of the Amendment are numerous and so comprehensive that little room for original discussion remains. A reference to some of them will show its true and settled meaning and point the way to its right application here.

In *United States* v. *Wonson,* 1 Gall. 5, 20; 28 Fed. Cas. 745, 750, a case decided in 1812 and often cited with approval by this court, it was said by Mr. Justice Story, after quoting the words of the Amendment: "Beyond all question, the common law here alluded to is not the common law of any individual State, (for it probably differs in all), but it is the common law of England, the grand reservoir of all our jurisprudence. . . . Now, according to the rules of the common law the facts once tried by a jury are never reëxamined, unless a new trial is granted in the discretion of the court, before which the suit is depending, for good cause shown; or unless the judgment of such court is reversed by a superior tribunal, on a writ of error, and a *venire facias de novo* is awarded.

This is the invariable usage settled by the decisions of ages."

In *Parsons* v. *Bedford*, 3 Pet. 433, decided in 1830, the same learned justice, speaking for this court, said (p. 446): "The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy. . . . One of the strongest objections originally taken against the Constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases. As soon as the Constitution· was adopted, this right was secured by the Seventh Amendment of the Constitution proposed by Congress, and which received an assent of the people so general as to establish its importance as a fundamental guarantee of the rights and liberties of the people." And then coming to the clause, "and no fact tried by a jury shall be otherwise reëxamined in any court of the United States, than according to the rules of the common law," he continued (pp. 447, 448): "This is a prohibition to the courts of the United States to reëxamine any facts tried by a jury in any other manner. The only modes known to the common law to reëxamine such facts, are the granting of a new trial by the court where the issue was tried, or to which the record was properly returnable, or the award of a *venire facias de novo*, by an appellate court, for some error of law which intervened in the proceedings."

In *Walker* v. *New Mexico &c. Railroad Co.*, 165 U. S. 593, 596, decided in 1897, where the Amendment was again under consideration, it was said by this court, speaking through Mr. Justice Brewer: "Its aim is not to preserve mere matters of form and procedure but substance of right. This requires that questions of fact in common law actions shall be settled by a jury, and that the court shall not assume directly or indirectly to take from the jury or to itself such prerogative. . . . Now

a general verdict embodies both the law and the facts. The jury, taking the law as given by the court, apply that law to the facts as they find them to be and express their conclusions in the verdict. The power of the court to grant a new trial if in its judgment the jury have misinterpreted the instructions as to the rules of law or misapplied them is unquestioned, as also when it appears that there was no real evidence in support of any essential fact. These things obtained at the common law; they do not trespass upon the prerogative of the jury to determine all questions of fact. . . ."

In *Capital Traction Co. v. Hof*, 174 U. S. 1, 13, decided in 1899, the subject was much considered, and, following a careful review of the prior decisions, it was said by Mr. Justice Gray, who spoke for the court: "It must therefore be taken as established, by virtue of the Seventh Amendment of the Constitution, that either party to an action at law (as distinguished from suits in equity or in admiralty) in a court of the United States, where the value in controversy exceeds twenty dollars, has the right to a trial by jury; that, when a trial by jury has been had in an action at law, in a court either of the United States or of a State, the facts there tried and decided cannot be reëxamined in any court of the United States, otherwise than according to the rules of the common law of England; that by the rules of that law, no other mode of reexamination is allowed than upon a new trial, either granted by the court in which the first trial was had or to which the record was returnable, or ordered by an appellate court for error in law; and therefore that, unless a new trial has been granted in one of those two ways, facts once tried by a jury cannot be tried anew, by a jury or otherwise, in any court of the United States."

These decisions make it plain, first, that the action of the Circuit Court of Appeals in setting aside the verdict and assuming to pass upon the issues of fact and to direct

a judgment accordingly must be tested by the rules of the common law; second, that, while under those rules that court could set aside the verdict for error of law in the proceedings in the Circuit Court and order a new trial, it could not itself determine the facts; and, third, that when the verdict was set aside there arose the same right of trial by jury as in the first instance. How, then, can it be said that there was not an infraction of the Seventh Amendment? When the verdict was set aside the issues of fact were left undetermined, and until they should be determined anew no judgment on the merits could be given. The new determination, according to the rules of the common law, could be had only through a new trial, with the same right to a jury as before. Disregarding those rules, the Circuit Court of Appeals itself determined the facts, without a new trial. Thus, it assumed a power it did not possess and cut off the plaintiff's right to have the facts settled by the verdict of a jury.

While it is true, as before said, that the evidence produced at the trial was not sufficient to sustain a verdict for the plaintiff and that the Circuit Court erred in refusing so to instruct the jury, this does not militate against the conclusion just stated. According to the rules of the common law, such an error, like other errors of law affecting a verdict, could be corrected on writ of error only by ordering a new trial. In no other way could an objectionable verdict be avoided and full effect given to the right of trial by jury as then known and practiced. And this procedure was regarded as of real value, because, in addition to fully recognizing that right, it afforded an opportunity for adducing further evidence rightly conducing to a solution of the issues. In the posture of the case at bar the plaintiff is entitled to that opportunity, and for anything that appears in the record it may enable her to supply omissions in her own evidence, or to show inac-

curacies in that of the defendant, which will rightly entitle her to a verdict and judgment in her favor.

We do not overlook the fact that at common law there were two well-recognized instances in which the verdict could be disregarded and the case disposed of without a new trial. One was where the defendant's plea confessed the plaintiff's cause of action and set up matter in avoidance which, even if true, was insufficient in law to constitute a bar or defense; and the other was where the plaintiff's pleading, even if its allegations were true, disclosed no right of recovery. If in either instance a verdict was taken, the court nevertheless could make such disposition of the case as was required by the state of the pleadings, and this because the issues settled by the verdict were wholly immaterial. In the first instance the court's action was invoked by a motion for judgment *non obstante veredicto*, and in the latter by a motion to arrest judgment on the verdict. Thus we find it is said in Smith's Action at Law (12th ed., p. 147), a recognized authority on common law procedure: "A motion for judgment *non obstante veredicto* is one which is only made by a plaintiff. . . . It is given when, upon an examination of the whole pleadings, it appears to the court that the defendant has admitted himself to be in the wrong, and has taken issue on some point, which, though decided in his favour by the jury, still does not at all better his case. A motion 'in arrest of judgment' is the exact reverse of that for judgment *non obstante veredicto*. The applicant in the one case insists that the plaintiff is entitled to the judgment of the court, although a verdict has been found against him. In the other case, that he is not entitled to the judgment of the court, although a verdict has been delivered in his favour. Like the motion for judgment *non obstante veredicto*, that in arrest of judgment must always be grounded upon something apparent on the face of the pleadings." To the same effect are 1 Chitty on Pleading,

687; Stephen on Pleading, 96–98.; *Rand* v. *Vaughan*, 1
Bing. N. C. 767; *Pim* v. *Grazebrook*, 2 C. B. 429, 444;
*Schermerhorn* v. *Schermerhorn*, 5 Wend. 513; *Bellows* v.
*Shannon*, 2 Hill, 86; *McFerran* v. *McFerran*, 69 Indiana,
29, 32; *Lewis* v. *Foard*, 112 N. Car. 402; *Manning* v. *City
of Orleans*, 42 Nebraska, 712; *McCoy* v. *Jones*, 61 Oh. St.
119, 129. In *Bond* v. *Dustin*, 112 U. S. 604, 608, and *Van
Stone* v. *Stillwell & Bierce Mfg. Co.*, 142 U. S. 128, 135,
this court, recognizing that this was the extent of the
common law practice, held that a motion in arrest of
judgment could not be sustained for an insufficiency in
the evidence, but only for a defect apparent on the face
of the record proper. Thus, it will be perceived that the
rules of the common law, permitting a judgment *non
obstante veredicto* and the arrest of judgment on a verdict,
did not embrace cases like the present, but only those in
which the pleadings presented no material issue requiring
a trial or verdict.

In the trial by jury, the right to which is secured by the
Seventh Amendment, both the court and the jury are
essential factors. To the former is committed a power of
direction and superintendence, and to the latter the ul-
timate determination of the issues of fact. Only through
the coöperation of the two, each acting within its appro-
priate sphere, can the constitutional right be satisfied.
And so, to dispense with either or to permit one to disre-
gard the province of the other is to impinge on that right.

This was plainly recognized in *Barney* v. *Schmeider*,
9 Wall. 248, decided in 1869. That was an action in
assumpsit, in which the defendant pleaded the general
issue. The trial in the Circuit Court was before a jury,
and the evidence consisted of the testimony taken a few
days before on another trial. This testimony was vo-
luminous and was put in with the consent of the parties
and the approbation of the court. But it was not read
to the jury, because the court regarded it as necessarily

requiring a verdict for the plaintiff. In a charge briefly referring to it and explaining why it was not read, the court instructed the jury that their verdict should be for the plaintiff, and the defendant excepted. Such a verdict was returned and judgment was given on it. This court reversed the judgment, and Mr. Justice Miller, delivering the opinion, referred to the constitutional right to a trial by jury and said, *inter alia* (pp. 251, 252):

"As the defendant in this case did not waive his right to have the facts tried by a jury, it was the duty of the court to submit such facts to the jury that was sworn to try them. It is needless to say that this was not done. The statement is clear that the case was decided upon the testimony taken on a former trial, and not read before this jury, because the court had heard it in the first case, and did not deem it necessary to be heard by the jury in this case.

"It is possible to have a jury trial in which the plaintiff, having failed to offer any evidence at all, or any competent evidence, the jury finds for the defendant for that very reason. And in such case it is strictly correct, if the plaintiff does not take a non-suit, for the court to instruct the jury to find for the defendant.

"But we have never before heard of a case in which the jury were permitted, much less instructed, to find a verdict for the plaintiff on evidence of which they knew nothing except what is detailed to them in the charge of the court. It is obvious that if such a verdict can be supported here, when the very act of the court in doing this is excepted to and relied on as error, the trial by jury may be preserved in name, but will be destroyed in its essential value; and become nothing but the machinery through which the court exercises the functions of a jury without its responsibility.

"It is insisted with much ingenuity that in this case there was no disputed fact for the jury to pass upon, and

that the only issue in the case being one of law, it was proper for the court to dispose of it. If this were so, the instruction of the court might be sustained, provided the undisputed facts necessary to sustain the verdict had been submitted to the jury."

A case much in point is *Hodges* v. *Easton*, 106 U. S. 408, decided in 1882. It was an action in trover, wherein the allegations of the complaint were all put in issue by the answer. On a trial by jury in the Circuit Court a special verdict was returned consisting of responses to interrogatories specially propounded by the court but not embracing all the issues presented by the pleadings. Following the reception of the verdict the plaintiffs moved for judgment in their favor, and the defendants for a new trial on the ground that the verdict did not dispose of all the issues. After hearing these motions the court refused to grant a new trial, and gave judgment for the plaintiffs on "the special verdict of the jury, and facts conceded or not disputed upon the trial." When the case came here the defendants complained that their constitutional right to a trial by jury had been violated, and the plaintiffs insisted that the Circuit Court had but conformed to the local practice sanctioned by numerous decisions of the Supreme Court of the State where the Circuit Court was held, and that it therefore should be presumed, nothing appearing to the contrary, that the special verdict and the facts conceded or not disputed upon the trial disposed of all the issues presented by the pleadings and justified the action of the Circuit Court. Responding to these contentions this court said, speaking through Mr. Justice Harlan (pp. 411, 412):

"It is not necessary, in this opinion, to enter upon an examination of those decisions, or to consider how far the local law controls in determining either the essential requisites of a special verdict in the courts of the United States, or the conditions under which a judgment will be

presumed to have been supported by facts other than those set out in a special verdict. The difficulty we have arises from other considerations. The record discloses that the jury determined a part of the facts, while other facts, upon which the final judgment was rested, were found by the court to have been conceded or not disputed. . . . We then have a case at law, which the jury were sworn to try, determined, as to certain material facts, by the court alone, without a waiver of jury trial as to such facts. It was the province of the jury to pass upon the issues of fact, and the right of the defendants to have this done was secured by the Constitution of the United States. They might have waived that right, but it could not be taken away by the court. Upon the trial, if all the facts essential to a recovery were undisputed, or if they so conclusively established the cause of action as to have authorized the withdrawal of the case altogether from the jury, by a peremptory instruction to find for plaintiffs, it would still have been necessary that the jury make its verdict, albeit in conformity with the order of the court. The court could not, consistently with the constitutional right of trial by jury, submit a part of the facts to the jury, and, itself, determine the remainder without a waiver by the defendants of a verdict by the jury. . . . It has been often said by this court that the trial by jury is a fundamental guarantee of the rights and liberties of the people. Consequently, every reasonable presumption should be indulged against its waiver. For these reasons the judgment below must be reversed."

Even more in point is *Baylis* v. *Travellers' Insurance Co.*, 113 U. S. 316, decided in 1885. It was an action on a policy of accident insurance, and on the trial before a jury in the Circuit Court the parties differed as to whether the plaintiff's evidence was sufficient to sustain a verdict in her favor, no evidence being presented by the defendant. The court directed a verdict for the plaintiff, subject to

its opinion on the sufficiency of the evidence, and the jury conformed to that direction. On further consideration, and construing the evidence in a manner deemed most favorable to the plaintiff, the court ruled that it was insufficient, because admitting of but one conclusion, namely, that the insured's death resulted from a cause not covered by the policy. Judgment was then given for the defendant notwithstanding the verdict, and the plaintiff brought the case here. The judgment was reversed, with directions to grant a new trial, for reasons stated by Mr. Justice Matthews as follows (pp. 320, 321):

'If, after the plaintiff's case had been closed, the court had directed a verdict for the defendant on the ground that the evidence, with all inferences that the jury could justifiably draw from it, was insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, it would have followed a practice sanctioned by repeated decisions of this court. *Randall* v. *Baltimore & Ohio Railroad*, 109 U. S. 478, and cases there cited. And, in that event, the plaintiff, having duly excepted to the ruling in a bill of exceptions, setting out all the evidence, upon a writ of error, would have been entitled to the judgment of this court, whether, as a matter of law, the ruling against him was erroneous.

"Or, if in the present case, a verdict having been taken for the plaintiff by direction of the court, subject to its opinion whether the evidence was sufficient to sustain it, the court had subsequently granted a motion on behalf of the defendant for a new trial, and set aside the verdict, on the ground of the insufficiency of the evidence, it would have followed a common practice, in respect to which error could not have been alleged, or it might, with propriety, have reserved the question, what judgment should be rendered, and in favor of what party, upon an agreed statement of facts, and afterwards rendered judgment upon its conclusions of law. But, without a waiver of

the right of trial by jury, by consent of parties, the court errs if it substitutes itself for the jury, and, passing upon the effect of the evidence, finds the facts involved in the issue and renders judgment thereon.

"This was what was done in the present case. It may be that the conclusions of fact reached and stated by the court are correct, and, when properly ascertained, that they require such a judgment as was rendered. That is a question not before us. The plaintiff in error complains that he was entitled to have the evidence submitted to the jury, and to the benefit of such conclusions of fact as it might justifiably have drawn; a right he demanded and did not waive; and that he has been deprived of it, by the act of the court, in entering a judgment against him on its own view of the evidence, without the intervention of a jury. In this particular, we think error has been well assigned.

"The right of trial by jury in the courts of the United States is expressly secured by the Seventh Article of Amendment to the Constitution, and Congress has, by statute, provided for the trial of issues of fact in civil cases by the court without the intervention of a jury, only when the parties waive their right to a jury by a stipulation in writing. Rev. Stat., §§ 648, 649.

"This constitutional right this court has always guarded with jealousy. *Elmore* v. *Grymes*, 1 Pet. 469; *De Wolf* v. *Rabaud*, 1 Pet. 476; *Castle* v. *Bullard*, 23 How. 172; *Hodges* v. *Easton*, 106 U. S. 408."

In principle, these cases are decisive of the question arising on the motion for judgment on the evidence notwithstanding the verdict. They show that it is the province of the jury to hear the evidence and by their verdict to settle the issues of fact, no matter what the state of the evidence, and that while it is the province of the court to aid the jury in the right discharge of their duty, even to the extent of directing their verdict where the insufficiency

or conclusive character of the evidence warrants such a direction, the court cannot dispense with a verdict, or disregard one when given, and itself pass on the issues of fact. In other words, the constitutional guaranty operates to require that the issues be settled by the verdict of a jury, unless the right thereto be waived. It is not a question of whether the facts are difficult or easy of ascertainment, but of the tribunal charged with their ascertainment, and this, we have seen, consists of the court and jury, unless there be a waiver of the latter.

But the suggestion is made that sufficient warrant for setting aside the verdict and rendering judgment on the evidence without a new trial is to be found in the rules of the common law in respect of demurrers to evidence and nonsuits. It therefore will be well to see what those rules were and whether they support the suggestion.

The leading English cases dealing with demurrers to evidence as employed at common law are *Middleton* v. *Baker*, Cro. Eliz. 752; *Wright* v. *Pindar*, Aleyn, 18; *S. C.*, Style, 34, and *Gibson* v. *Hunter*, 2 H. Bla. 187, 205. The last, which adhered to the principle of the other two, was much considered in the House of Lords, and the opinion delivered by Lord Chief Justice Eyre, who spoke for all the judges, was to the following effect: (a) A demurrer to the evidence is a proceeding whereby the court, whose province it is to answer all questions of law, is called upon to declare what the law is "upon the facts shewn in evidence," and, "in the nature of the thing, the question of law to arise out of the fact, cannot arise until the fact is ascertained." (b) Such a demurrer is permissible only when proposed by one party, joined in by the other and allowed by the court. It must contain an express and distinct admission by the demurrant of every fact which the evidence of his adversary conduces to prove, else he cannot insist that the latter join in the demurrer; and the admission, to be effective to that end, must be of the facts,

and not merely the evidence from which their existence is inferable. (c) When the matter of fact is so ascertained and shown in the demurrer, the case is deemed ripe for judgment in matter of law, and the jury properly may be discharged from giving a verdict.

This statement of the true office and use of a demurrer to evidence was both accepted and applied by this court in *Fowle* v. *Alexandria,* 11 Wheat. 320, decided in 1826. There the court below had sustained such a demurrer, which merely set forth and admitted the evidence as introduced at the trial, as well the testimony of witnesses as written documents. We excerpt the following from the opinion, which was by Mr. Justice Story (pp. 321, 322, 323):

"There is no joinder in demurrer on the record, which is probably a mere defect in the transcript, as the court proceeded to give judgment upon the demurrer in favor of the defendants. Without a joinder in demurrer, no such judgment could be properly entered; and such joinder ought not to have been required or permitted while there was any matter of fact in controversy between the parties. . . . The true and proper object of such a demurrer is to refer to the court the law arising from facts. It supposes, therefore, the facts to be already admitted and ascertained, and that nothing remains but for the court to apply the law to those facts. . . . Indeed, the case made for a demurrer to evidence, is, in many respects, like a special verdict. It is to state facts, and not merely testimony which may conduce to prove them. It is to admit whatever the jury may reasonably infer from the evidence, and not merely the circumstances which form a ground of presumption. . . . Upon examination of the case at bar, it will be at once perceived that the demurrer to evidence, tried by the principles already stated, is fatally defective. The defendants have demurred, not to facts, but to evidence of facts; not to

positive admissions, but to mere circumstances of presumption introduced on the other side."

And that this was not a new doctrine in this court is shown in *Young* v. *Black*, 7 Cranch, 565, 568, decided thirteen years before, where, in declining to disturb the action of the court below in refusing to compel a joinder in a demurrer to the evidence, it was said: "The party demurring is bound to admit as true, not only all the facts proved by the evidence introduced by the other party, but also all the facts which that evidence legally may conduce to prove. It follows that it [the demurrer] ought never to be admitted where the party demurring refuses to admit the facts which the other side attempts to prove; and it would be as little justifiable where he offers contradictory evidence, or attempts to establish inconsistent propositions."

True, in *United States Bank* v. *Smith*, 11 Wheat. 171, and *Columbian Insurance Co.* v. *Catlett*, 12 Wheat. 383, 389, the rule that the demurrer should set forth the facts rather than the evidence from which they are inferable was not strictly enforced, but in each of those cases the opposite party voluntarily joined[1] in the demurrer, thereby consenting that the case be withdrawn from the jury and submitted to the court on the evidence embodied in the demurrer; so, they are without bearing here, save as the opinions contain some observations making strongly for the views expressed in *Fowle* v. *Alexandria*. Thus, in *United States Bank* v. *Smith*, the demurrer was criticised as substituting the court in the place of the jury, which, while true of the demurrer there, would not be true of one rightly drafted and allowed; and in *Columbian Insurance Co.* v. *Catlett*, it was said: "The plaintiff was not bound to have joined in the demurrer without the defendant's

---

[1] In *United States Bank* v. *Smith* the joinder is shown in the record, although not mentioned in the opinion. It also is shown in the report of the decision of the lower court. 1 Fed. Cas. 733.

having distinctly admitted, upon the record, every fact which the evidence introduced on his behalf conduced to prove; and that when the joinder was made, without insisting on this preliminary, the court is at liberty to draw the same inferences in favor of the plaintiff, which the jury might have drawn."

*Pawling* v. *United States,* 4 Cranch, 219, and *Chinoweth* v. *Haskell,* 3 Pet. 92, are also cases in which, as shown by the record, there was a voluntary joinder in the demurrer. In the former the record, after setting forth the demurrer, shows this order: "Wherefore let the jury aforesaid be discharged by the court here, by the assent of the parties, from giving any verdict."

The doctrine stated in *Gibson* v. *Hunter,* and recognized by this court in *Young* v. *Black* and *Fowle* v. *Alexandria,* has been applied not only in the lower Federal courts but in several of the state courts. *Pickel* v. *Isgrigg,* 6 Fed. Rep. 676; *Johnson* v. *United States,* 13 Fed. Cas. 868, 872; *Miller* v. *Baltimore & Ohio R. Co.,* 17 Fed. Cas. 304; *Patty* v. *Edelin,* 18 Fed. Cas. 1344; *Copeland* v. *New England Insurance Co.,* 22 Pick. 135; *Golden* v. *Knowles,* 120 Massachusetts, 336; *Dormady* v. *State Bank,* 2 Scam. 236; *Ware* v. *McQuillan,* 54 Mississippi, 703; *Ingram* v. *Jacksonville Street R. Co.,* 43 Florida, 324; *Bass* v. *Rublee,* 76 Vermont, 395, 401; *Chapize* v. *Bane,* 1 Bibb, 612; *Sawyer* v. *Fitts,* 2 Port. 9.

At common law, if on a demurrer to the evidence judgment was given for one party when it should have been for the other, the error was corrected in the appellate tribunal by directing the proper judgment, and this because the error was confined to the judgment, and did not reach the facts as ascertained and shown in the demurrer. But when the reversal was for error in allowing the demurrer, the latter necessarily went for naught, and, as there remained no ascertained facts on which to base a judgment, a new trial was deemed essential. Thus in

*Gibson* v. *Hunter, supra,* one of the questions was, whether, considering the state of the evidence and the admissions in the demurrer, the plaintiff was obliged to join in it. The question was resolved in the negative, and, as this eliminated the demurrer on which judgment had been given in the court of King's Bench, the judgment of reversal was accompanied by a direction for a new trial. And in *Fowle* v. *Alexandria, supra,* where this court ruled that the demurrer ought not to have been allowed, the judgment rendered thereon was reversed with a like direction.  So, in the present case when the verdict was set aside there remained no ascertained facts on which a judgment might be rested, and that made a new trial necessary.

Enough has been said to make it plain, as we think, that there was nothing in the nature or operation of the demurrer to evidence at common law which has any tendency to show that issues of fact tried by a jury could be reëxamined otherwise than on a new trial.

We come, then, to the other branch of the suggestion. A nonsuit at common law was a dismissal of the plaintiff's action without an adjudication, other than the imposition of costs, and constituted no bar to another action for the same cause.  Originally granted where the plaintiff made default when his presence was required, or otherwise failed to proceed in due course, it came to be applied on the trial when, although actually present, he chose, in view of the state of his evidence, not to risk an adverse verdict. But unless he assented to being nonsuited on the evidence it was essential that a verdict be taken, even although it was certain to be against him.  In other words, such a nonsuit was always voluntary, and never compulsory. Mr. Starkie says of this proceeding: "The doctrine of nonsuits is founded on the ancient practice, according to which the plaintiff was bound by himself or his attorney to appear at the trial, prosecute his suit, and hear the ver-

·dict; and in case, after being called, he made default, he was decreed to have abandoned his suit, and was nonsuited. This ancient practice has long been used as the medium by which the court intimates an opinion that the plaintiff has not made out a sufficient case for the consideration of the jury. The plaintiff is therefore formally called, although by himself or his counsel he has actually appeared in court. In conformity, however, with the old practice, being called, he may if he choose appear, and if he do, the case must go to the jury." Starkie Ev. 806, 4th London ed. In the course of a similar statement, Mr. Tidd says: "The plaintiff in no case is compellable to be nonsuited; and therefore, if he insist upon the matter being left to the jury, they must give in their verdict, which is general or special." 2 Tidd's Pr. 796, 1807 ed. Mr. Lilly describes the office and nature of the proceeding as follows: "Nonsuit is when a man brings a personal action, and doth not prosecute it with effect, or else upon the trial refuses to stand a verdict; then he becomes nonsuited, which is recorded by the court, and the defendant recovers his costs against him." "The court cannot compel the plaintiff to appear and stand a verdict; but if the plaintiff appears, or his counsel or attorney appears for him, he cannot be afterwards nonsuit, but the jury must deliver in their verdict." 2 Lil. Reg. 230, 231, 1719 ed. And Mr. Chitty says: "A nonsuit must always be *voluntary*, *i. e.* by the plaintiff's counsel submitting to the same or not appearing, and in no case can it be adverse or without implied consent." 3 Chitty's Gen. Pr. 910. To the same effect are 3 Bl. Com. 376, 377; *Dewar* v. *Purday*, 3 Ad. & E. 166, 170; *Corsar* v. *Reed*, 21 L. J. R. (N. S.) Q. B. 18; *Stancliffe* v. *Clark*, 21 L. J. R. (N. S.) Exch. 129; *Minchin* v. *Clement*, 1 B. & Ald. 252. In the last case the court, on ruling that a verdict theretofore given for the plaintiff could not be sustained, was requested to order a nonsuit instead of a new trial; but the request was denied, Lord

Ellenborough, C. J., observing: "It is in the plaintiff's option to be nonsuited or not."

The question whether a compulsory nonsuit could be ordered on the evidence was presented to this court in 1828 in *Elmore* v. *Grymes*, 1 Pet. 469, a case in which the Circuit Court, conceiving that the plaintiff's evidence was insufficient to sustain a verdict in his favor, had nonsuited him without his assent. Speaking for all the members of this court but one, Chief Justice Marshall disposed of the question by saying (p. 471): "The Circuit Court had no authority to order a peremptory nonsuit, against the will of the plaintiff. He had a right by law to a trial by a jury, and to have had the case submitted to them. He might agree to a nonsuit; but if he did not so choose, the court could not compel him to submit to it." The decision in that case was approved and reaffirmed in *D'Wolf* v. *Rabaud*, 1 Pet. 476, 497; *Crane* v. *Morris*, 6 Pet. 598, 609, where Mr. Justice Story said the point was not longer "open for controversy;" *Silsby* v. *Foote*, 14 How. 218, 222, and *Castle* v. *Bullard*, 23 How. 172, 183.

It being thus certain that the common law rules in respect of nonsuits recognized that the plaintiff had a right to have the verdict of the jury taken, which he could waive or assert at his option, it follows that those rules give no support to the suggestion before mentioned.

In what has been said we would not be understood as implying that a motion for a compulsory nonsuit and a demurrer to the evidence are equivalents of a request for a directed verdict, for while they are sometimes spoken of as analogous to it, this only means that for the purpose of each the evidence must be taken most strongly in favor of the opposite party. In other respects they are essentially unlike. A motion for a compulsory nonsuit looks to an arrest of the trial and a dismissal of the cause, leaving the merits undetermined and the plaintiff free

to sue again, while a request for a directed verdict looks to a completion of the trial and an adjudication of the merits through the accustomed coöperation of the court and jury. Full recognition of this, as also of its bearing here, is found in *Oscanyan* v. *Arms Co.,* 103 U. S. 261, 264, where it is said: "The difference in the two modes is rather a matter of form than of substance, *except in the case of a nonsuit a new action may be brought, whereas in the case of a verdict the action is ended, unless a new trial be granted either upon motion or upon appeal.*"

Equally pronounced is the difference between a demurrer to the evidence and a request for a directed verdict; for if on such a demurrer, properly joined in and allowed, judgment is not given for the demurrant, it is necessarily given for his opponent, while if a request for a directed verdict is denied the party making the request may yet receive the jury's verdict and a judgment thereon. And when a judgment on a demurrer to the evidence is reversed because given for the wrong party, the error is corrected by ordering a judgment for the other party, whereas when a judgment is reversed for error in granting or refusing a request to direct a verdict, judgment is not ordered for either party, but a new trial is awarded. This was so at common law, and it has been the uniform course of action in this court from the beginning. These distinctions are so substantial as to show that the suggested analogy is far from complete.

We come now to two decisions in this court which, although not involving the real question here, namely, the power of a Federal court to reëxamine, otherwise than according to the rules of the common law, issues of fact which have been determined by the verdict of a jury, yet have such an indirect bearing thereon that they ought not to be passed unnoticed.

In *Central Transportation Co.* v. *Pullman's Palace Car Co.,* 139 U. S. 24, 38, a case coming here from the eastern

district of Pennsylvania, it appeared that on a trial to the Circuit Court and a jury the court, following a statute of the State, had entered a compulsory nonsuit which, according to the state law, terminated that suit but was not an adjudication of the merits or a bar to another suit on the same cause of action. This court, deeming it important to notice the question of its own jurisdiction, proceeded to inquire whether such a judgment was subject to review on writ of error, and in the course of the inquiry expressed the opinion that the state statute established a practice or mode of procedure which the conformity provisions of the Federal statutes required the Circuit Court to follow. But it was stated that the question was "not mentioned by counsel in argument," and, as the opinion contains no reference to the right of trial by jury or to the Seventh Amendment, it well may be that the bearing of the latter on the applicability of the state statute to the trial in the Circuit Court was not actually considered.

The other case is *Coughran* v. *Bigelow*, 164 U. S. 301, which originated in a territorial court, where the Seventh Amendment was applicable. On a trial by jury a compulsory nonsuit was entered according to a local statute, for an insufficiency in the plaintiff's evidence, without prejudice to his right to sue again, and when the case came here the judgment was affirmed, it being directly held that granting such a nonsuit does not infringe the constitutional right.

Of these two cases it is to be observed: (1) Although they hold, one by implication and the other expressly, that the constitutional right of trial by jury is not invaded by a statute authorizing the court to enter a compulsory nonsuit against a plaintiff for an insufficiency in his evidence, when he is not thereby prevented from suing again on the same cause of action, they neither hold nor suggest that, consistently with that right, the court can refuse to take the verdict of the jury, or disregard it when taken,

and enter a binding judgment on the evidence. (2) Assuming, without so deciding, that they should be accepted and followed in respect of the particular matter to which they are addressed, that is, the granting of an involuntary nonsuit which leaves the merits unadjudicated, they afford no justification whatever for overruling or departing from the repeated decisions of this court, reaching back to the beginning of the last century, wherein it uniformly has been held (a) that we must look to the common law for a definition of the nature and extent of the right of trial by jury which the Constitution declares "shall be preserved;" (b) that the right so preserved is the right to have the issues of fact presented by the pleadings tried by a jury of twelve, under the direction and superintendence of the court; (c) that the rendition of a verdict is of the substance of the right, because to dispense with a verdict is to eliminate the jury which is no less a part of the tribunal charged with the trial than is the court, and (d) that when the issues have been so tried and a verdict rendered they cannot be reëxamined otherwise than on a new trial granted by the court in which the first trial was had or ordered by the appellate court for some error of law affecting the verdict.

*Coughran* v. *Bigelow* recognizes that this is the true conception of trial by jury, for it is there said (p. 307), "if the evidence be not sufficient to warrant a recovery, it is the duty of the court to instruct the jury accordingly, and, if the jury disregard such instruction, to set aside the verdict." Why instruct the jury in such a case if they have no office to perform? Why contemplate that they may not conform to the instruction if it be immaterial whether they do or not? And why take their verdict or have any concern about it if none is required? The answers are given in prior decisions, which hold, as before shown, that in such a case it is essential "that the jury make its verdict, albeit in conformity with the order of the

court," and that if there be a verdict "the action is ended, unless a new trial be granted either upon motion or upon appeal."

Whether in a given case there is a right to a trial by jury is to be determined by an inspection of the pleadings and not by an examination of the evidence. If the pleadings present material issues of fact, either party is entitled to have them tried to the court and a jury, and this is as true of a second trial as of the first. Whether the evidence is sufficient to sustain a verdict for one party or the other is quite another matter and does not affect the mode of trial, but only the duty of the court in instructing the jury and of the latter in giving their verdict. The issues to which the jury must respond are those presented by the pleadings, and this whether the evidence be disputed or undisputed and whether it be ample or meagre. To speak, therefore, of the evidence as determinative of the right to a trial by jury is to confuse the test of that right with a different test applicable only in determining whether a particular verdict should be directed.

In the present case certain well-defined issues of fact were presented by the pleadings, which the plaintiff, as also the defendant, was entitled by the Constitution to have tried to the court and a jury. Such a trial was had and resulted in a general verdict resolving all the issues in the plaintiff's favor. That verdict operated, under the Constitution, to prevent a reëxamination of the issues save on a new trial granted by the trial court in the exercise of its discretion or ordered by the appellate court for error of law. At the trial the defendant requested that a verdict in its favor be directed, and had the court indicated its purpose to do that, it would have been open to the plaintiff, under the then prevailing practice, to take a voluntary nonsuit, which would have enabled her to make a fuller and better presentation of her case, if

the facts permitted, at another trial in a new suit. But the defendant's request being denied and a verdict being returned for the plaintiff, she recovered a judgment. That judgment the Circuit Court of Appeals reversed, and rightly so, because the defendant's request, in the state of the evidence, ought, as matter of law, to have been granted. The reversal operated to set aside the verdict and to put the issues at large, as they were before it was given. But, instead of ordering a new trial, as was required at common law, the Circuit Court of Appeals itself reëxamined the issues, resolved them in favor of the defendant, and directed judgment accordingly. This we hold could not be done consistently with the Seventh Amendment, which not only preserves the common law right of trial by jury, but expressly forbids that issues of fact settled by such a trial shall be reëxamined otherwise than "according to the rules of the common law."

To the suggestion that in so holding we are but adhering to a mere rule of procedure at common law there is a two-fold answer: First, the terms of the Amendment and the circumstances of its adoption unmistakably show that one of its purposes was to require adherence to that rule, which in long years of practice had come to be regarded as essential to the full realization of the right of trial by jury; and, second, the right to a new trial in a case such as this, on the vacation of a favorable verdict secured from a jury, is a matter of substance and not of mere form, for it gives opportunity, as before indicated, to present evidence which may not have been available or known before, and also to expose any error or untruth in the opposing evidence. As is said in Blackstone's Commentaries, vol. 3, p. 391: "A new trial is a rehearing of the cause before another jury. . . .   The parties come better informed, the counsel better prepared, the law is more fully understood, the judge is more master of the

subject; and nothing is now tried but the real merits of the case."

> *The judgment of the Circuit Court of Appeals is accordingly modified by eliminating the direction to enter judgment for the defendant notwithstanding the verdict, and by substituting a direction for a new trial.*

MR. JUSTICE HUGHES, with whom concur MR. Justice HOLMES, MR. JUSTICE LURTON and MR. JUSTICE PITNEY, dissenting.

I concur in the decision of the court so far as it holds that the Circuit Court of Appeals was right in reversing the judgment; but I am unable to agree with the conclusion that the Circuit Court of Appeals was bound to order a new trial, and was without power, under the Seventh Amendment, to follow the state practice in directing the entry of the judgment to which, as matter of law, the defendant was entitled.

The serious and far-reaching consequences of this decision are manifest. Not only does it overturn the established practice of the Federal courts in Pennsylvania in applying, under the Conformity Act, the provisions of the state law, but it erects an impassable barrier—unless the Constitution be amended—to action by Congress along the same line for the purpose of remedying the mischief of repeated trials and of thus diminishing in a highly important degree the delays and expense of litigation. It cannot be gainsaid that such a conclusion is not to be reached unless the constitutional provision compels it. I cannot see that it does compel it. On the contrary, I submit, with the utmost respect, that the Pennsylvania practice adopted by the Circuit Court of Appeals, is entirely in conformity with the Seventh Amendment.

What, then, is this case? It was an action upon a policy of insurance. It was triable by jury, but the province of

228 U. S.     HUGHES, HOLMES, LURTON and PITNEY, JJ., dissenting.

the jury was to decide questions of fact, not questions of law. This court concludes, as did the Court of Appeals, that "the evidence did not admit of a finding that the policy was in force at the time of the insured's death." In other words, after the plaintiff had had full opportunity to present her case and to show facts for the consideration of the jury, and the case on both sides had been closed, it appeared that there were no facts whatever upon which the jury would be warranted in finding a verdict in her favor. Hence, says this court, the defendant was entitled to a direction of a verdict in its favor, as it requested. Had the trial court rightly applied the law, the case would properly have ended in a final judgment for the defendant. But the trial court erred in the law, and consequently the jury found a verdict for the plaintiff—not upon facts but without any facts upon which they could rest it. Now it is said that a statute which permits the trial court or the appellate court, after that wrongful verdict, to correct the error, and in so doing not only to set aside the verdict but to direct the entry of the judgment to which the defendant in law was entitled is, as applied to a case in the Federal court, contrary to the Constitution.

The Seventh Amendment provides that "no fact tried by a jury shall be otherwise reëxamined in any Court of the United States, than according to the rules of the common law." But, wherein has any matter of fact tried by a jury been reëxamined? Concededly, there was no fact to be tried by a jury; the case as made was barren of any such fact; and there being none, there has been no reexamination of it. How can it be said that the Circuit Court of Appeals has determined the facts or has passed upon issues of fact? Whether there was any evidence for the jury was a question of law. The trial court, in wrongly deciding it, did not convert it into a question of fact; it was not altered by the verdict, but remained the same in its nature—a question for the determination of the court.

That, it seems to me, is the substance of the matter, and all else is form and procedure.  Whether in such a case, on the error being shown, a new trial should be ordered, or whether the litigation should be ended by a prompt entry of the judgment which should have followed a right decision in the first instance, is a matter to be governed by the applicable rules of practice; but, as I view it, it is not a matter withdrawn from legislative control by the constitutional provision for trial by jury, which is concerned with the settlement of disputes of fact and not with the determination of legal questions or with the consequences which should ensue when that determination is decisive of the right of recovery on the case made.

It is well to note what has been ruled in the Third Circuit upon this precise question.  For the practice was there deliberately adopted after careful consideration.  It has commended itself to the bench and bar as a salutary measure making for the improvement of the administration of justice.  And, it should be observed that the constitution of the State of Pennsylvania, where the practice obtains, also provides that the right of trial by jury shall remain inviolate.  (See Const. Pa. 1776; Declaration of Rights, XI; 1790, Art. IX, § 6; 1838, Art. IX, § 6; 1873, Art. I, § 6.)  In *Smith* v. *Jones*, 181 Fed. Rep. 819, 823, the Circuit Court of Appeals for that circuit thus reviewed the matter:

"The practice of entering judgments *non obstante veredicto* has long existed in Pennsylvania, and it enables the case to be concluded by a verdict, while the entry of judgment thereon is made dependent on the court's opinion on a reserved question of law.  This permits the judge to give to the decisive law question on which a case turns a more careful examination than he can do in the stress of trial.  Moreover, if an appellate court on review of such judgment finds error, it can reverse and direct entry of judgment for the other party and avoid a retrial.  Long

experience in this practice has convinced the bar and bench of the State of its value in conducing to a more careful and deliberate consideration of the law by the trial judge and to the avoidance of retrials. The practice in. Pennsylvania is of statutory origin, as stated by Judge Acheson in *Casey* v. *Pennsylvania Asphalt Co.* (C. C.), 109 Fed. Rep. 746, adopted in 114 Fed. Rep. 189, 52 C. C. A. 145, and the principles involved in its application are set out in *Fisher* v. *Sharadin,* 186 Pa. St. 568, 40 Atl. Rep. 1091, and *Boyle* v. *Mahanoy City,* 187 Pa. St. 1, 40 Atl. Rep. 1093. Under the Conformity Act this practice has long been followed in the Federal courts in Pennsylvania and met with the approval of this court in *Carstairs* v. *American Bonding & Trust Co.,* 116 Fed. Rep. 449, 54 C. C. A. 85."

In the *Carstairs Case* to which the court thus refers, decided over ten years ago, the action was brought in the Circuit Court for the Eastern District of Pennsylvania, upon a policy of fidelity insurance. The defendant asked for a binding instruction. The court reserving that question, submitted the case to the jury which found a verdict for the plaintiff. After argument, the court concluded that the defendant was right, that there was no case for the jury and hence set aside the verdict and directed judgment for the defendant upon the point reserved. 112 Fed. Rep. 620. The Court of Appeals sustained this action of the Circuit Court (116 Fed. Rep. 449), Circuit Judge Gray delivering the opinion. There was, however, a dissent by Circuit Judge Acheson, who thought the mode of procedure was an unwarrantable departure from the constitutional provision. (*Id.,* p. 455.) This called forth a concurring opinion from Circuit Judge Dallas, who said (*id.,* pp. 456–457):

"The judgment here complained of was entered upon a point which the learned trial judge reserved in these words: 'I reserve the question whether there is any evi-

dence to go to the jury in support of the plaintiffs' claim.' In our opinion, this was a good reservation. The Supreme court of Pennsylvania has, after argument and reargument before a full bench, distinctly so decided (*Fisher* v. *Scharadin*, 186 Pa. 565, 40 Atl. 1091; *Boyle* v. *Borough of Mahanoy City*, 187 Pa. 1, 40 Atl. 1093); and within the knowledge of the writer, the Circuit Court for the Eastern district of Pennsylvania, from which this case comes, has in a number of instances, and without protest or disapproval in any, reserved precisely the same point. Indeed, counsel in this cause appear to have regarded the practice as settled, for 'the record shows no objection or any exception to the form of the reservation.' *Boyle* v. *Borough of Mahanoy City, supra.* . . . But in our opinion there is no substantial difference between a judgment entered upon a directed verdict for defendant and one entered in his favor notwithstanding a verdict rendered for plaintiff, subject to the question whether there was any evidence to warrant it. 'Whether there be any evidence which entitles the plaintiff to recover is necessarily a question of law' (*Fisher* v. *Scharadin, supra*); and that question it is which, by either method of procedure, and with like effect in each, the court decides. No encroachment is made upon the domain of the jury where either course is pursued. Its province of finding facts from evidence is not at all invaded. All that is adjudged is that a verdict which is unsupported by any evidence cannot properly be made the basis of a legal judgment; and the soundness of this fundamental proposition is now, we think, too well established to admit of question or to be open to debate."

See also *Spencer* v. *Duplan Silk Co.*, 112 Fed. Rep. 638; 115 Fed. Rep. 689; 191 U. S. 526, 527, 532.

The practice which had been followed before the *Carstairs Case*, and was expressly sanctioned in that case, continued to be observed. In 1905, the legislature of

SLOCUM v. NEW YORK LIFE INS. CO.      405

228 U. S.   HUGHES, HOLMES, LURTON and PITNEY, JJ., dissenting.

Pennsylvania broadened it by permitting a reservation not simply of leave to enter judgment for the defendant but for either party when there was a request for binding instructions. As the Supreme Court of Pennsylvania pointed out, in construing the statute, in *Dalmas* v. *Kemble*, 215 Pa. St. 410, it was not intended in any way to impair and did not impair the function of the jury to deal with disputed questions of fact, but its purpose was to facilitate the disposition of questions of law. It was classed as one of the "practical reforms" instituted by the State "for facilitating business without impairing settled legal principles." It took account of the "growing complexity of issues, the constantly increasing pressure upon the trial lists, the taking of testimony in shorthand, and the consequent hurry of trials;" and it promoted the proper despatch of the work of the courts while conserving the essential rights of suitors.

Chief Justice Mitchell, in delivering the opinion of the court, said (*id.*, pp. 411–413): "The act being so recent it is important that it should be examined closely, and its proper construction settled. Its terms are: 'Whenever upon the trial of any issue, a point requesting binding instructions has been reserved or declined, the party presenting the point may . . . move the court to have all the evidence taken upon the trial duly certified and filed, so as to become part of the record and for judgment *non obstante veredicto* upon the whole record; whereupon it shall be the duty of the court . . . to enter such judgment as should have been entered upon that evidence.'

"This statute makes no radical innovation on the settled line of distinction between the powers of the court and the jury. It shows no intention to infringe, even if it could constitutionally do so, the province of the jury to pass upon the credibility of witnesses and the weight of oral testimony. The court has long had authority to direct

a verdict for defendant when it was of opinion that the plaintiff, even if all his evidence be believed, has failed to make out his case. . . .

"The act of 1905 is another step in the same direction. It broadens the power of the judge in this respect, that whereas heretofore the verdict was required to be for the plaintiff and the reservation to be of leave to enter judgment for the defendant *non obstante,* now what is reserved is a request for binding direction to the jury and may be for either plaintiff or defendant. But though thus enlarged so as to include both parties, the power of the judge is the same as it was before. He is 'to enter such judgment as should have been entered upon that evidence,' or in other words to treat the motion for judgment as if it was a motion for binding directions at the trial, and to enter judgment as if such direction had been given and a verdict rendered in accordance. What the judge may do is still the same in substance, but the time when he may do it is enlarged so as to allow deliberate review and consideration of the facts and the law upon the whole evidence. If upon such consideration it shall appear that a binding direction for either party would have been proper at the close of the trial the court may enter judgment later with the same effect. But, on the other hand, if it should appear that there was conflict of evidence on a material fact, or any reason why there could not have been a binding direction then there can be no judgment against the verdict now. As already said there is no intent in the act to disturb the settled line of distinction between the provinces of the court and the jury. The act is capable of usefulness in allowing time for mature consideration, but it should not be carried beyond its legitimate intent."

The provisions of this statute, as thus construed, were applied in the Federal courts in Pennsylvania. The propriety of the practice was challenged in *Fries-Breslin Co.*

v. *Bergen*, 168 Fed. Rep. 360–364; 176 Fed. Rep. 76, 81; and it was sustained by both the Circuit Court and the Circuit Court of Appeals. Circuit Judge Gray, in delivering the opinion of the latter court, said:

"This Pennsylvania practice act has been referred to, and has not infrequently been brought to the attention of this court in cases where the granting or refusal of judgments *non obstante veredicto* have been the subjects of review. The act enlarges the scope of the common law motion for judgment for plaintiff, notwithstanding the verdict for the defendant, by permitting it to be made by either plaintiff or defendant, when the verdict is against either. It is in general a more convenient method, so far as a defendant is concerned, of reaching practically the same result as was sought by a motion for a compulsory nonsuit, or for peremptory instructions at the close of the evidence, or by a motion in arrest of judgment, made by the defendant after the verdict or by the practice prevalent in the Pennsylvania courts, of directing a verdict for the plaintiff and reserving the question, whether there is any evidence in the case entitling the plaintiff to recover. We think, under the conformity provisions of section 914 of the Revised Statutes (U. S. Comp. St. 1901, p. 684), the Circuit Court was required to recognize the practice authorized by the said Pennsylvania act of 1905, there being nothing incongruous therein with the organization of the Federal courts or their settled rules of procedure."

The plaintiff then petitioned this court for a writ of *certiorari*, and one of the grounds stated was that the Circuit Court had no power to enter judgment for the defendant notwithstanding the verdict. The petition was denied. *Fries-Breslin Co., Petitioner, v. Bergen*, 215 U. S. 609. And the same practice has been followed since. *Smith* v. *Jones, supra.* See also *Pittsburgh Construction Co.* v. *West Side Belt R. R. Co.*, 151 Fed. Rep. 125; 154 Fed. Rep.

929; *West Side Belt R. R. Co.* v. *Pittsburgh Construction Co.,* 219 U. S. 92, 96, 102.

The Seventh Amendment, it cannot be doubted, deals with matters of substance and not with mere matters of form. It guarantees the right of trial by jury, but it does not raise forms of motions or merely modal details to the dignity of constitutional rights. In numerous particulars, common law practice has been altered by statute in many States and the new procedure of the so-called code States has been followed, as near as may be, by virtue of the act of Congress, in the courts of the United States. When the question is raised of invasion of the constitutional right, we must always look to the substance of what is done and not to mere names or formal changes. It is of no consequence that at common law the motion for judgment *non obstante veredicto* was made only by the plaintiff, or was granted on something apparent on the face of the pleadings. We are not concerned with the mere use of this or any other descriptive term.

The substantial thing is that the common law recognized that the function of the jury was to deal with controversies of fact. If there was a question of law, it was for the court.

The dominating idea, in overturning the practice below, seems to be that at common law, if there was an issue of fact upon the pleadings, the plaintiff was entitled to have a verdict taken in any event; that is, if he did not voluntarily take a nonsuit, it was essential that a verdict be rendered, notwithstanding that upon the evidence there was no question of fact for the jury.

This would seem to be a misconception of the fundamental principles of the common law with respect to jury trials and to result from unjustified implications from the practice as to nonsuits as well as from a failure to regard the full scope and import of common law procedure.

It is not a new thing that a party should be able to challenge the legal sufficiency of the evidence adduced

against him and call upon the court to answer the question
of law whether upon the facts shown there should be a
recovery, nor is it a new thing that when he does so the
court should give judgment without the intervention of
the jury, and if the trial court errs in its ruling upon the
law, the reviewing court should set the matter right and
order the proper judgment to be entered.

This was accomplished by demurring to the evidence.
This was a proceeding by which the judges of the court
were called upon to declare what the law was upon the
facts shown in evidence. It was analogous to the demur-
rer upon the facts alleged in pleading. The reason, it is
said, for demurring to the evidence, was that the jury,
if they pleased, might refuse to find a special verdict, and
then the facts would not appear upon the record. The
party demurring had to admit the truth of all the evidence
against him; and if this were circumstantial, he was bound
to admit every fact in favor of his adversary which the
circumstances might tend to prove. Unless he did so, the
other party was not bound to join in the demurrer. If,
however, the demurrer was in proper form and embraced
all the requisite concessions, the other party was bound to
join. The result was that there was nothing left for the
consideration of the jury, and the usual practice was to
discharge it, although it was recognized as proper for the
jury to assess the damages *conditionally* subject to the
determination of the demurrer. 2 Tidd's Pr. *865–*867.

This matter was reviewed by the House of Lords in the
leading case of *Gibson* v. *Hunter,* 2 H. Bl. 187, decided in
the year 1793, where Lord Chief Justice Eyre, in delivering
the answer of the judges, said: "All our books agree, that
if a matter of *record,* or other matter in *writing,* be offered
in evidence in maintenance of an issue joined between
the parties, the adverse party may insist upon the jury
being discharged from giving a verdict, by demurring to
the evidence, and obliging the party offering the evidence

to join in demurrer.   He cannot refuse to join in demurrer, he must join or waive the evidence.   Our books also agree, that if *parol* evidence be offered, and the adverse party demurs, he who offers the evidence *may* join in demurrer if he will.   We are therefore thus far advanced, that the demurrer to evidence is not necessarily confined to *written* evidence.   The language of our books is very indistinct upon the question, whether the party offering *parol* evidence should be *obliged* to join in demurrer.   Why is he obliged to join in demurrer, when the evidence which he offered is in writing?   The reason is given in *Croke's* report of *Baker's Case*,[1] because, says the book, '*there cannot be any variance of matter in writing.*'   Parol evidence is sometimes certain, and no more admitting of any variance than a matter in writing, but it is also often loose and indeterminate, often circumstantial.   The reason for obliging the party offering evidence in writing, to join in demurrer, applies to the first sort of parol evidence, but it does not apply to parol evidence which is loose and indeterminate, which may be urged with more or less effect to a jury, and least of all will it apply to evidence of circumstances, which evidence is meant to operate beyond the proof of the existence of those circumstances, and to conduce to the proof of the existence of other facts.   And yet if there can be no demurrer in such cases, there will be no consistency in the doctrine of demurrers to evidence, by which the application of the law to the fact on an issue is meant to be withdrawn from a jury, and transferred to the judges.   If the party who demurs will admit the evidence of the fact, the evidence of which fact is loose and indeterminate, or in the case of circumstantial evidence, if he will admit the existence of the fact, which the circumstances offered in evidence conduce to prove, there will then be no more variance in this parol evidence, than

---

[1] Cro. Eliz. 753.

in a matter in writing; and the reasons for compelling the party who offers the evidence to join in demurrer, will then apply, and the doctrine of demurrers to evidence will be uniform and consistent.    That this is the regular course of proceeding, in respect to parol evidence of the nature I have been describing, I think may be collected from the known case upon this subject, *Baker's Case*.    There is also another case, *Wright* v. *Pindar*, as it stands reported in *Aleyn's* Reports,[1] which carries the doctrine further, and home to every case of evidence circumstantial in its nature, affording ground for a conclusion of fact from fact; and the two cases taken together, I think, prove satisfactorily, that the course is that which I have already supposed, and which would remove all the difficulties that are in the way of obliging the party to join in demurrer upon parol evidence.    *Baker's Case*, after stating that the party must join in demurrer, or waive his evidence, where a matter in writing is shewn in evidence, goes on thus: 'If the Plaintiff produces witness to prove any matter in fact upon which a matter of law arises, if the defendant admits their testimony to be true, there also the defendant may demur in law upon it, but then he ought to admit the evidence given by the plaintiff to be true.' Those cases have very carefully marked the precise ground, upon which a party may demur to evidence; and prove that if a party *may* demur, the other party *must* join in demurrer.    According to *Aleyn's* Report of the case of *Wright* v. *Pindar*, which case underwent very serious consideration, it was resolved, that he that demurs upon 'the evidence, ought to confess the whole matter of fact to be true, and not to refer that to the judgment of the court; *and if the matter of fact be uncertainly alleged, or that it be doubtful whether it be true or no, because offered to be proved only by presumptions or probabilities,* and the

---

[1] Al. 18.

other party demurs thereupon, he that alleges this matter, *cannot* join in demurrer with him, but ought to pray the judgment of the court, that he *may not be admitted* to his demurrer, unless he will *confess the matter of fact to be true.'* It seems to follow as a necessary conclusion, that if he will confess the matter of fact to be true, there he is to be admitted to his demurrer, and that if he is admitted, the other party must join in demurrer.   My Lords, it is said in some of our books, that upon a demurrer entered upon parol evidence, the party offering the evidence may choose whether he will join in demurrer or not.   But after having stated the two authorities which I have mentioned, I think those passages in the books must be understood with the qualification mentioned in both those authorities, 'unless the adverse party will confess the evidence to be true.'   The matter of fact being confessed, the case is ripe for judgment in matter of law upon the evidence, and may then be properly withdrawn from the jury; and being entered on record will remain for the decision of the Judges."   (*Id.*, pp. 206–209.)

If on a demurrer to the evidence judgment was given for one party when it should have been given for the other, the error was corrected in the appellate tribunal by directing the proper judgment.   It is now said in referring to this practice, that this was because the error was confined to the judgment, and did not reach the facts as ascertained and shown in the demurrer.   But what was the error?   What was the basis of the judgment and upon what ground was it reversed and the proper judgment directed?   The facts, by the proceeding on the demurrer, were made a part of the record, and the question of the legal sufficiency of the evidence was thus one of law arising upon the record.   The court dealt with the question of law, that is, with the legal insufficiency of the evidence, and directed judgment which, as matter of law, followed the case made.

It is also said that when the reversal was for error in allowing the demurrer, the latter necessarily went for naught, and as there remained no ascertained facts on which to base a judgment, a new trial was deemed essential; and *Gibson* v. *Hunter, supra,* and *Fowle* v. *Alexandria,* 11 Wheat. 320, are cited. But in *Gibson* v. *Hunter, supra,* the reason for holding that the demurrer could not be allowed and that no judgment could be given, was thus stated (p. 209): "The examination of the witnesses in this case, has been conducted so loosely, or this demurrer has been so negligently framed, that there is no manner of certainty in the state of facts, upon which any judgment can be founded." In other words, the case was lacking in the record of facts with the essential admissions of the demurring party which were necessary to support a judgment, and there was no option but to award a new trial because of the way the record had been made up. And in *Fowle* v. *Alexandria, supra,* the ruling was that issue could not be joined upon the demurrer so long as any matter of fact remained in controversy between the parties; that no party could insist upon the other party's joining in the demurrer without distinctly admitting upon the record every fact and every conclusion of fact which the evidence given for his adversary conduced to prove. The court said (p. 323): "Upon examination of the case at bar, it will be at once perceived that the demurrer to evidence, tried by the principles already stated, is fatally defective. The defendants have demurred, not to facts, but to evidence of facts; not to positive admissions, but to mere circumstances of presumption introduced on the other side. . . . Even if the demurrer could be considered as being exclusively taken to the plaintiff's evidence, it ought not to have been allowed without a distinct admission of the facts which that evidence conduced to prove. But when the demurrer was so framed as to let in the defendant's evidence, and thus to rebut what the

other side aimed to establish, and to overthrow the presumptions arising therefrom, by counter-presumptions, it was the duty of the circuit court to overrule the demurrer, as incorrect, and untenable in principle. The question referred by it to the court, was not a question of law, but of fact."

The court, therefore, concluded that in this posture of the case, it was bound to order a new trial, and it was added: "We may say, as was said by the judges in *Gibson* v. *Hunter*, 2 H. Bl. 187, that this demurrer has been so incautiously framed, that there is no manner of certainty in the state of facts, upon which any judgment can be founded. Under such a predicament, the settled practice is to award a new trial, upon the ground that the issue between the parties, in effect, has not been tried." (*Id.*, p. 324.) The necessary implication is that, had the demurrer been properly framed and the record properly made, so that there had been certainty in the facts and the proper basis for the determination of a question of law, no new trial would have been ordered.

How can it be said that these authorities furnish any support for the conclusion which has been reached in this case? For this court has found no uncertainty in the state of facts shown by the record, and it has not been unable to determine the question arising thereon. On the contrary, the record being made up in an appropriate manner and the question being properly raised, this court holds that there was no evidence whatever to sustain a verdict for the plaintiff and because there is certainty in the record adjudges that the trial court erred in refusing a binding instruction.

The practice of demurring to the evidence was recognized in *Pawling* v. *United States*, 4 Cranch, 219; *Young* v. *Black*, 7 Cranch, 565; *United States Bank* v. *Smith*, 11 Wheat. 171, 182; *Columbian Insurance Co.* v. *Catlett*, 12 Wheat. 383, 389; *Thornton* v. *Bank of Washington*, 3 Pet.

36; *Chinoweth* v. *Lessee of Haskell*, 3 Pet. 92; *Corfield* v. *Coryell*, 4 Wash. C. C. 371, 386; *Johnson* v. *United States*, 5 Mason, 425, 436; *Pickel* v. *Isgrigg*, 6 Fed. Rep. 676; and other cases.

After the decision of this court in *Fowle* v. *Alexandria, supra,* Mr. Justice Story, who delivered the opinion in that case, thus laid down the rules with regard to demurrers to evidence in *Johnson* v. *United States, supra* (p. 436):

"The general nature and operation of such a demurrer has been expounded with great force and correctness in the opinion delivered by Lord Chief Justice Eyre, in the case of *Gibson* v. *Hunter* (2 H. Bl. 187). The Supreme Court of the United States has also, on various occasions, been called upon to discuss the nature and effect of the proceeding. But I shall do no more at present, than to refer to some of the leading cases, not meaning to comment on them. . . . The result of the whole is, that the party demurring is bound to admit not merely all the facts which the evidence directly establishes, but all which it conduces to prove. The demurrer should state the facts, and not merely the evidence of facts; and it is utterly inadmissible to demur to the evidence, when there is contradictory testimony to the same points, or presumptions leading to opposite conclusions, so that what the facts are remains uncertain, and may be urged with more or less effect to a jury. The court, however, will, in favour of the party, against whom the demurrer is sought, as it withdraws from the jury the proper consideration of his case, make every inference for him, which the facts in proof would warrant a jury to draw. But if the facts are so imperfectly and loosely stated, that the Court cannot arrive at a satisfactory conclusion, that the judgment can be maintained upon the actual presentation of the evidence of these facts, then the course is to reverse the judgment, and to award a *venire facias de novo.*"

In *Pawling* v. *United States*, 4 Cranch, 219, the United

States sued in debt upon an official bond. The defendants pleaded that the bond had been delivered as an *escrow* upon a condition which had not been performed. The United States demurred to the evidence produced on behalf of the defendants. The court held the evidence insufficient and judgment went in favor of the United States. This court reversed the judgment and directed that judgment be entered for the defendants in the court below.

That the practice in the present case did not differ in its essential features from that permitted at common law is shown by the decision of this court in *Chinoweth* v. *Lessee of Haskell*, 3 Pet. 92. That was an action in ejectment. What took place on the trial is thus stated by Chief Justice Marshall (p. 94): "At the trial, the defendants demurred to the plaintiffs' testimony, and the jury found a verdict for the plaintiffs, subject to the opinion of the court on the demurrer. The court overruled the demurrer and gave judgment for the plaintiffs." The applicable principles were thus stated (p. 96):

"The defendants in the district court having withdrawn their cause from the jury by a demurrer to evidence, or having submitted to a verdict for the plaintiffs subject to that demurrer, cannot hope for a judgment in their favour, if, by any fair construction of the evidence, the verdict can be sustained. If this cannot be done, the judgment rendered for the defendants in error must be reversed." On reviewing the evidence, this court found that the demurrer ought to have been sustained. And this was its judgment (p. 98):

"The judgment is reversed, and the cause remanded, with directions to enter judgment in favour of the defendants in the district court."

Here then is a case, in this court, which contradicts the conclusion that there is no permissible practice under the Constitution by which, when a verdict has been taken

for the plaintiff and it has been found, the point being duly made, that there is no legal basis for it in the evidence, judgment can be directed for the defendant.

It is said that there was a *voluntary* joinder in demurrer. Undoubtedly, the plaintiffs in the District Court did join in the demurrer, but in what sense did they join voluntarily? The demurrer to the evidence in the *Chinoweth Case* was manifestly well taken. And this being so, the other party was bound to join in it. As it was said in *Gibson* v. *Hunter, supra,* the cases "prove that if a party *may* demur, the other party *must* join in demurrer." Whether a demurrer should be allowed was the initial question for the trial court, but if the case was one where it was proper to allow the demurrer, and it was duly taken and allowed, the other party was not entitled to stand on his evidence and go to the jury. Let it be assumed that he could take a nonsuit; but this is not to say that by refusing to join in the demurrer he had the right to have his case, although insufficient in law for that purpose, submitted to the decision of the jury. Of course if there were some defect or variance, which he believed he could remedy, it would be natural for him to withdraw his case; but if he had proved all he could possibly prove, there would be no reason for a withdrawal unless he was willing to abandon the litigation. If he did not desire to do this, but wished to proceed, insisting upon the legal sufficiency of the evidence to which the demurrer was taken, he had to join in it. For, unless he did so, he waived his evidence (*Baker's Case, supra; Gibson* v. *Hunter, supra*) and was left without any evidence to go upon; while, if he did join in the demurrer, he had to abide the judgment of the court upon the point of law. He had no right to reach the jury, against proper objection, when his evidence raised no question of fact. In the *Chinoweth Case*, the plaintiffs, confronted with the demurrer, and desiring to stand upon their evidence and not to waive it, complied with the rules

of law which required them to join in the demurrer. The judgment was determined by the decision of the question of law. This court, finding no basis for the verdict which had been taken for the plaintiffs subject to the opinion of the court on the demurrer, did not order a new trial but directed judgment for the defendants.

The practice of demurring to the evidence was cumbrous. It fell into disuse, and the practice of moving for a direction of a verdict came to take its place. The fundamental question, however, of the legal insufficiency of the evidence, remained the same. As this court said in *Parks v. Ross*, 11 How. 362, 373, "But a jury has no right to assume the truth of any material fact, without some evidence legally sufficient to establish it. It is, therefore, error in the court to instruct the jury that they may find a material fact, of which there is no evidence from which it may be legally inferred. Hence the practice of granting an instruction like the present, which makes it imperative upon the jury to find a verdict for the defendant, and which has in many States superseded the ancient practice of a demurrer to evidence. It answers the same purpose, and should be tested by the same rules. A demurrer to evidence admits not only the facts stated therein, but also every conclusion which a jury might fairly or reasonably infer therefrom."

Can it be doubted that it would be competent for Congress, if it saw fit, to reinstate the old practice of demurring to the evidence and on a proper demurrer to its legal sufficiency, with an admission of all facts that his evidence tended to prove, to compel the other party to join in the demurrer; and to provide that thereupon the court should decide the question of law and enter judgment accordingly? Or that, if the trial court decided wrongly, the appellate court should be at liberty to direct the entry of the judgment to which, as matter of law, a party was entitled? And could not Congress, following the anal-

ogies of a still earlier day, before written pleadings were introduced, permit the question to be raised by a motion upon the trial? Could it not now provide, when the testimony is reported stenographically, that the record so made and appropriately approved by the court should constitute the record of the evidence for the purpose of determining the question of law thus raised?

Again, the court having this power to decide the question of law and to enter judgment accordingly, can it not be authorized to take provisionally the verdict of the jury to avoid the delay and expense of a new trial in case it should appear on a careful consideration of the evidence that it involved a dispute of fact which the jury should have resolved?

This is all, as it seems to me, that the Pennsylvania practice comes to. Had the old practice obtained, and had there been a demurrer to the evidence in this case, this court, in view of its holding that the "evidence did not admit of a finding that the policy was in force at the time of the insured's death," must necessarily have concluded that the demurrer was well taken; that the trial court would have been justified in directing judgment for the defendant without submitting the case to the jury; and that if it had not decided the question correctly the appellate court could so decide it and direct the entry of that judgment. The rest of the matter was simply the exercise of caution to avoid unnecessary litigation by taking the verdict of the jury so that it might be available if it appeared that the case was one for the jury.

The plaintiff did not take a nonsuit, or attempt in any way to dismiss her case. No question is presented with respect to her right to withdraw the suit; or to start again, if it had been withdrawn. It is said that, had the court indicated a purpose to direct a verdict for the defendant, the plaintiff might have taken a nonsuit; but the practice in the state and Federal courts had long been established

and must have been well understood. There is nothing to indicate to the contrary. The situation disclosed is that the plaintiff was standing upon her evidence contending, as she still contends, that it was sufficient to permit the jury to find in her favor. The defendant insisted that, conceding all that the evidence tended to prove, the plaintiff had no case for the jury. In this, the court now finds that the defendant was right. The defendant having made this point and the plaintiff, on the other hand, having asserted the sufficiency of the evidence and stood thereon, I find no ground for saying that the local practice was opposed to the principles of the common law in providing, in effect, that the question of law thus raised should be determined by the court, which should render judgment for the party entitled thereto.

This court has frequently said that it would deal with questions of this sort according to the substance of the matter. Thus, in *Oscanyan* v. *Arms Co.*, 103 U. S. 261, it was held that where it was shown by the opening statement of counsel that the contract on which the suit was brought was void as being either in violation of law or against public policy, the trial court might properly direct the jury to find a verdict for the defendant. The court, by Mr. Justice Field, said (*id.*, p. 266):

"Indeed, there can be, at this day, no serious doubt that the court may at any time direct a verdict when the facts are undisputed, and that the jury should follow such direction. The maxim that questions of fact are to be submitted to the jury, and not to be determined by the court, is not violated by this proceeding any more than by a nonsuit in a state court where the plaintiff fails to make out his case. The intervention of the jury is required only where some question of fact is controverted." In *Central Transportation Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, it was held that a state statute which authorized the judge presiding at the trial to order a judgment

of nonsuit where the evidence introduced by the plaintiff was insufficient in law to sustain a verdict, might be followed in the Federal court under Rev. Stat., § 914, and that the judgment so rendered might be reviewed here upon writ of error. The court said: "The difference between a motion to order a nonsuit of the plaintiff and a motion to direct a verdict for the defendant is, as observed by Mr. Justice Field, delivering a recent opinion of this court, 'rather a matter of form than of substance, except (that) in the case of a nonsuit a new action may be brought, whereas in the case of a verdict the action is ended, unless a new trial be granted, either upon motion or upon appeal.' *Oscanyan* v. *Arms Co.*, 103 U. S. 261, 264.

"Whether a defendant in an action at law may present in the one form or in the other, or by demurrer to the evidence, the defence that the plaintiff, upon his own case, shows no cause of action, is a question of 'practice, pleadings, and forms and modes of proceeding,' as to which the courts of the United States are now required by the act of Congress of June 1, 1872, c. 255, § 5, 17 Stat. 197, re-enacted in § 914 of the Revised Statutes, to conform, as near as may be, to those existing in the courts of the State within which the trial is had. *Sawin* v. *Kenny*, 93 U. S. 289; *Ex parte Boyd*, 105 U. S. 647; *Chateaugay Co., Petitioner*, 128 U. S. 544; *Glenn* v. *Sumner*, 132 U. S. 152, 156." (*Id.*, pp. 39–40.)

In other words, a practice which would not have been allowed in the absence of statute was permitted under the statute because in the substance of the thing it was entirely in accord with the principles of the common law. In *Coughran* v. *Bigelow*, 164 U. S. 301, the constitutional question was directly presented, and after referring to the ruling in *Elmore* v. *Grymes*, 1 Pet. 469, that in a Federal court there was no authority to order a peremptory nonsuit against the will of the plaintiff (*Crane* v. *Morris*, 6 Pet. 598; *Castle* v. *Bullard*, 23 How. 172), the court said:

"The foundation for those rulings was not in the constitutional right of a trial by jury, for it has long been the doctrine of this court that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed, and that, if the evidence be not sufficient to warrant a recovery, it is the duty of the court to instruct the jury accordingly, and, if the jury disregard such instruction, to set aside the verdict. *Parks* v. *Ross*, 11 How. 362; *Schuchardt* v. *Allens*, 1 Wall. 359; *Pleasants* v. *Fant*, 22 Wall. 116, 120. And, in the case of *Oscanyan* v. *Arms Co.*, 103 U. S. 264, it was said by Mr. Justice Field, in delivering the opinion of the court, that the difference between a motion to order a nonsuit of the plaintiff and a motion to direct a verdict for the defendant is 'rather a matter of form than of substance.'

"That the cases above cited, which held that the Circuit Court of the United States had no authority to order peremptory nonsuits, were based, not upon a constitutional right of a plaintiff to have the verdict of a jury, even if his evidence was insufficient to sustain his case, but upon the absence of authority, whether statutory or by a rule promulgated by this court, is shown by the recent case of *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24, 38, where it was held that, since the act of Congress of June 1, 1872, c. 255, § 5, 17 Stat. 197, reënacted in § 914 of the Revised Statutes, courts of the United States are required to conform, as near as may be, in questions of 'practice, pleadings and forms and modes of proceeding' to those existing in the courts of the State within which the trial is had, and a judgment of the Circuit Court of the United States for the Eastern District of Pennsylvania, ordering a peremptory nonsuit, in pursuance of a state statute, was upheld. It is the clear im-

plication of this case that granting a nonsuit for want of sufficient evidence is not an infringement of the constitutional right of trial by jury.

"As there was a statute of the Territory of Utah authorizing courts to enter judgments of peremptory nonsuit, there was no error in the trial court in granting the motion for a nonsuit in the present case, nor in the judgment of the Supreme Court affirming such ruling; if, indeed, upon the entire evidence adduced by the plaintiffs enough did not appear to sustain a verdict." (*Id.*, pp. 307–308.)

In the present case, the point is not that the ordinary practice on a motion for the direction of a verdict is identical with that on a demurrer to the evidence, but that the latter as well as the former was clearly permitted by the Constitution and that the modern application of it, in a convenient form through the local statute in question, was not a substantial departure.

I do not see that the authorities relied upon in the opinion of the court sustain its ruling. They may be briefly reviewed. In *United States* v. *Wonson*, 1 Gall. 5, 20, it was held that where a cause had once been tried by a jury in the District Court, there could not be a new trial by a jury in the Circuit Court. The statement of Mr. Justice Story with regard to the constitutional provision and the importance of trial by jury have obvious reference to cases of disputed questions of fact with which it is the province of the jury to deal. Facts once tried by a jury are not reëxamined and the court is not to substitute its judgment of the facts for the judgment of the jury, but, in such case, should order a new trial.

Applying this rule to the present case, if this court found that on the trial there was any question of fact for the jury to decide, it could not sustain, as it does sustain, the Circuit Court of Appeals, in reversing the judgment for the plaintiff.

424 OCTOBER TERM, 1912.

Hughes, Holmes, Lurton and Pitney, JJ., dissenting. 228 U. S.

In *Parsons* v. *Bedford*, 3 Pet. 433, it was held that it was not the intention of Congress by the act of May 26, 1824, 4 Stat. 62, c. 181, to confer upon this court the power, in reviewing a judgment of the District Court of Louisiana, to decide questions of fact which had been passed upon by the jury. The court said that no points of law were brought under review, and that the whole object was "to present the evidence here in order to establish the error of the verdict in matters of fact." The remarks of the court in *Walker* v. *New Mexico & Southern Pacific R. R. Co.*, 165 U. S. 593, 596, plainly have reference to the same subject. Thus, it is said that the Seventh Amendment "does not attempt to regulate matters of pleading or practice," that "its aim is not to preserve mere matters of form and procedure but substance of right" and that "this requires that questions of fact in common law actions shall be settled by a jury, and that the court shall not assume directly or indirectly to take from the jury or to itself such prerogative."

In *Barney* v. *Schmeider*, 9 Wall. 248, the court received the testimony taken on a former trial, but did not have it read to the jury. The court informed the jury of its purport and directed them to find a verdict in favor of the plaintiff. In other words, the court followed the practice of directing a verdict by a jury without the evidence upon which it should rest being properly presented to the jury. The court overruled the contention that there was not a disputed question of fact, saying, after reviewing the case, "Where there is any discrepancy, however slight, the court must submit the matter to which it relates to the jury, because it is their province to weigh and balance the testimony and not the court's. The proposition is not, therefore, sustained, that nothing but a question of law was to be decided." (*id.*, p. 253.)

The cases mostly relied upon are those of *Hodges* v. *Easton*, 106 U. S. 408; and *Baylis* v. *Travellers' Insurance*

*Co.,* 113 U. S. 316. But, it is submitted that these cases neither control the matter nor are inconsistent with the principles which I have urged as determinative of this question.

In *Hodges* v. *Easton, supra,* there was a so-called special verdict, in answer to questions propounded by the court. But the questions and the verdict in response thereto, covered only a part of the material issues of fact. The court gave judgment upon the special verdict and upon what it described as "facts conceded or not disputed upon the trial." What these facts were, which lay outside the verdict, did not appear from the record. "No bill of exceptions was taken showing the evidence introduced by either party, nor was there a general verdict." This court said that having regard alone to the questions and answers propounded to the jury, it was clear that the plaintiffs had not proved their case. If it were presumed that there were no material facts beyond those found by the jury then the judgment was unauthorized; on the other hand, if there were other material facts they were found by the court and not by the jury. As the court pointed out, there was no waiver of a jury, by a stipulation in writing, as provided by the statute (Rev. Stat. §§ 648–649) and there was "nothing in the record from which such stipulation or waiver may be inferred." The case then was one in which the record afforded no basis for a judgment, and there was no alternative but to direct that a trial be had "upon all the material issues of fact."

In *Baylis* v. *Travellers' Insurance Co., supra,* the action was upon a policy of insurance to be paid to the plaintiff in case his father "should accidentally sustain bodily injury which should produce death within ninety days." After the close of the testimony, the defendant moved to dismiss on the ground that the evidence was insufficient to support a verdict. The motion was denied, the plaintiff insisting that there were questions of fact which should be

submitted to the jury.  The court then directed the jury to find a verdict for the plaintiff subject to its opinion upon the question whether the facts warranted a recovery. Subsequently the court denied a motion for judgment on the verdict in favor of the plaintiff and directed judgment to be entered for the defendant.  This court reversed the judgment and ordered a new trial.

The pith of the decision is that, despite what the trial judge said regarding the matter, there were really questions of fact for the jury, and that the trial judge could not take the place of the jury in deciding them.  The appellant challenged the judgment in this court upon that ground which was found to be well taken.  What was actually decided appears from the following statement of the opinion:

"But, without a waiver of the right of trial by jury, by consent of parties, the court errs if it substitutes itself for the jury, and, passing upon the effect of the evidence, finds the facts involved in the issue, and renders judgment thereon.

"This is what was done in the present case.  It may be that the conclusions of fact reached and stated by the court are correct, and, when properly ascertained, that they require such a judgment as was rendered.  That is a question not before us.  The plaintiff in error complains that he was entitled to have the evidence submitted to the jury, and to the benefit of such conclusions of fact as it might justifiably have drawn; a right he demanded and did not waive; and that he has been deprived of it, by the act of the court, in entering a judgment against him on its own view of the evidence, without the intervention of a jury.

"In this particular, we think error has been well assigned."  (Id., pp. 320–321.)

This being the point of the case, it would seem to be rather an extreme construction of the rest of the opinion,

in its references to practice, to treat it as an exhaustive statement of all the possibilities of legislative control over procedure within constitutional limits, or as laying down rules which would preclude the court in a case where there was *no* question of fact for the jury, from following the applicable state practice, or an act of Congress, in entering judgment for the party who, upon the record, was as matter of law entitled to it. That, as I regard the decision, is very far from its purpose and effect.

It is said, however, that a new trial affords opportunity to a plaintiff to better his case, by presenting evidence which may not have been available before. But we are not dealing with an application for a new trial upon the ground of newly discovered evidence or with the principles controlling an application of that sort. We are concerned with the question whether a party has a constitutional right to another trial, simply because the trial court erred in its determination of a question of law which was decisive of the case made. Had the trial court done what this court says it should have done, it would have directed a verdict for the defendant and if the jury, simply following the instruction of the trial court, had so found, final judgment would have been entered and no new trial would now be granted. Still the jury would not have passed upon any question of fact, but would simply have obeyed the judge. The opportunity to better the case on a second trial would probably be as welcome, but it would not be accorded. I am unable to see any basis for a constitutional distinction which raises a constitutional right to another trial in the one case and not in the other.

Of course, in any case, where there are questions of fact for the jury, the court cannot undertake to decide them unless a jury trial is waived. But, it would seem to be an entire misapprehension to say that trial by jury, in its constitutional aspect, requires the submission to the jury of evidence which presents no question for their

decision; and that, although there be no facts for the jury to pass upon, still the judgment which follows as matter of law, can be arrived at only through a verdict. This is to create a constitutional right out of the practice of taking verdicts by direction. The ancient method of challenging the sufficiency of the evidence by demurrer, and thereupon either discharging the jury altogether or assessing the damages conditionally to await the decision of the demurrer (Cro. Car. 143), reveals the function of court and jury in a clearer light, and shows that the idea that the judgment upon a trial where there is no evidence to sustain a finding by the jury, can be reached only through a verdict, could not have been entertained at the time the Constitution was adopted.

To repeat and conclude: All that has been done in the present case could, in substance, have been done at common law, albeit by a more cumbrous method. There has been no invasion of the province of the jury. That conclusively appears from the fact that this court holds that there was no basis for a finding by the jury in favor of the plaintiff. We have here a simplification of procedure adopted in the public interest to the end that unnecessary litigation may be avoided. The party obtains the judgment which in law he should have according to the record. I submit, with deference, that in now condemning this practice, long followed in the courts below, this court is departing from, instead of applying, the principles of the common law, and is extending rather than enforcing the constitutional provision.

I am authorized to say that MR. JUSTICE HOLMES, MR. JUSTICE LURTON and MR. JUSTICE PITNEY concur in this dissent.