## CINCINNATI, N. O. & T. P. RY. CO. v. LOVETT.

(Circuit Court of Appeals, Sixth Circuit. May 3, 1921.)

### No. 3418.

1. Railroads ☞276(1)—Liable only for willful or wanton injury to trespasser on train.

A carrier is liable to a trespasser on its freight train only in case the acts of the train crew in forcing him off should be classified as willful or wanton, or were characterized by recklessness or indifference to his injury in a degree equivalent to wantonness.

2. Railroads ☞282(11)—Evidence of willful injury to trespasser on train held insufficient to go to jury.

In an action for the death of a trespasser, who fell under a freight train while the crew was attempting to eject him, evidence that the train was moving only 10 miles an hour, at which speed men frequently mounted or dismounted, *held* to entitle defendant to a directed verdict on the ground it did not warrant an inference of willful or wanton injury.

In Error to the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Action by W. M. Lovett, administrator of the estate of George Hamblin, deceased, against the Cincinnati, New Orleans & Texas Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Edward Colston, of Cincinnati, Ohio (George Hoadly, of Cincinnati, Ohio, and Tye & Siler, of Williamsburg, Ky., on the brief), for plaintiff in error.

H. C. Gillis, of Williamsburg, Ky. (Joseph B. Snyder, of Williamsburg, Ky., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. Hamblin's administrator brought suit against the railway, in the court below, to recover damages for his

death. The plaintiff had verdict and judgment, and the railway brings error. The record presents only the question whether the defendant's request for peremptory instruction should have been granted. Hamblin lived near the southern edge of Kentucky. He and a friend, Campbell, decided to go to the nearest railroad town, and, from there, take a train about 30 miles north to Somerset, Ky. They did so, not attempting to get tickets and go on a passenger train, as they might have done, but stealing a ride on a freight train. This train carried 34 cars, mixed box cars and gondolas, was about a quarter of a mile long, had come from south of the Kentucky line and was bound for Somerset, which was a division point. Hamblin and Campbell, and four or five others traveling on the same plan, rode in different places on the train—it would seem with the knowledge of the train crew—until they reached a stop for water, at Ferguson, a water station one mile from the Somerset terminus. Here Hamblin and Campbell and the others dismounted during the stop and were instructed and warned by the train crew that they must not get back and must not ride any further. Hamblin and Campbell declared that they would not walk the remaining distance, and, as the train pulled out, they jumped on. Campbell took a position on, or at the end of, one of the box cars, and Hamblin was between the rear of a group of three gondolas and a box car just behind. Both were instructed to get off, but neither did so. The conductor and some of the crew on the coal cars forward of Hamblin threw coal at Campbell, throwing over Hamblin's head. Campbell was not hit, but he jumped off at once and was not hurt. Just after this, Hamblin either jumped or fell and was caught under the wheels and killed.

Defendant's motion to direct was upon two grounds: First, that it was conjecture whether Hamblin voluntarily dismounted or was coerced by the train crew; and, second, that there was no evidence of such wanton or willful conduct by the train crew as could alone justify recovery by such a trespasser as Hamblin was.

The first ground of the motion was based upon the familiar principle of Patton v. Railway, 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361. It is clear that any one of three theories of the accident to Hamblin is possibly true: (1) He may have fallen, accidentally, not in connection with any effort to get off. (2) It may be that, when he saw Campbell was no longer riding, he preferred to get off and walk in with his friend, and acted voluntarily in his effort to alight. (3) It may be that he was getting off because yielding to the fear that otherwise he would be put off by force or would be hurt by coal thrown at him. Plaintiff insists that the last theory is, under all the circumstances, so distinctly more probable than either of the others that its adoption would not be mere conjecture, but rather the result of substantial evidence, and hence that the jury's verdict could rightfully rest on this theory. We do not find it necessary to pass on this question, and, for the purposes of this opinion only, we assume that plaintiff is right in the position just stated.

[1, 2] All agree that Hamblin was a trespasser, that, at least after the notice which he received at Ferguson, he had no kind of excuse for continuing to ride, and that the defendant is liable only in case the acts

of the train crew in forcing him off ought to be classified as willful or wanton, or characterized by recklessness or indifference to his injury in that degree thought equivalent to wantonness. Purple v. Union Pacific (C. C. A. 8) 114 Fed. 123, 126, 51 C. C. A. 564, 57 L. R. A. 700. When the train started from Ferguson, just before Hamblin and Campbell got on, it had only a mile to go—about four train lengths. When Campbell jumped off, it had gone some 300 feet, as he, as plaintiff's witness, states. Obviously, it could not have attained much speed; the evidence indicates perhaps 5 miles an hour, but Campbell estimates it as "about 10 miles." We must therefore assume the speed to be something approaching, but not exceeding, that figure. There is nothing to indicate that there was, at that point, any bridge, culvert, fill, or abnormal roughness in the grading alongside the tracks (as in Toledo Ry. v. Gordon [C. C. A. 7] 143 Fed. 95, 74 C. C. A. 289). A coal gondola, such as these were, is provided with a stirrup at the end, midway between the drawbar and the corner, and with another on the side near the corner. The stirrups extend down to about two feet from the ground, and suitable handholds are provided. Just before Hamblin stepped or fell off, he was standing in the stirrup at the rear end, or perhaps straddling the sills of the two cars. For a man, standing there, to step around the corner of the car to the side stirrup, and then jump or step to the ground, or to mount the car by the reverse motions, either one while the car is in motion is a thing commonly done by the trainmen, or by any men in the habit of getting on and off while the train is in motion.

The class of riders to which Hamblin appeared to belong, is in the habit of getting on or off trains in motion under these conditions, and the trainmen had a right to assume that Hamblin belonged to this class, and would, ordinarily, be capable of dismounting from his position to the ground without injury while the train was moving. See Bolin v. Chicago R. R., infra. This same class of riders is known to the trainmen to include many rough and desperate characters, who must be handled literally without gloves. Though Hamblin did not attempt to resist, he was, in fact, armed with a pistol and brass knuckles, thus illustrating the reality of the danger which trainmen meet with such trespassers, and justifying methods which they would not use with women and children.

In considering whether the conduct of the trainmen on this occasion was, in any substantial degree, blameworthy we must not see abstract questions alone. As in every such question, the practical problem is the alternative one; if the action which they took was not lawful, what should they have done to keep within the law? Their right to put Hamblin off was undoubted; indeed, they were violating the railroad rules and federal laws if they did not put him off; and we do not doubt their right to require such a trespasser to get off while the train is in motion, because, if for no other reason, if the train is stopped for that purpose, these riders can and will, as these particular ones had done, get on again, unless there is a large force of trainmen to prevent it. The actual question, therefore, is whether it was the duty of these trainmen to have the train slow down to substantially less speed than this supposed 10 miles an hour before they compelled Hamblin to get

off. We think it was not, and that, having in view the proof and the familiar facts, there was no basis upon which the jury could rightfully rest the necessary inference of wanton or reckless disregard of Hamblin's rights. Of course, there was some element of risk in getting off; but the trainmen had no reason to apprehend that this would involve, to a man of Hamblin's class, so much risk as to justify an inference of intent to injure, or of that wantonness or recklessness which is equivalent to intention, when they made the show of force necessary to induce him to desist from stealing further transportation.

Nor was there anything reasonably indicating to the train crew that he would have been so terrified by their threats and orders as to interfere with the ordinary capacity to handle himself, which they might assume him to have. If he was drunk enough to make him unsteady on his feet (as in Southern Ry. v. Alford, 150 Ky. 808, 150 S. W. 985), they did not know it.

We do not fix any limit of speed at which the duty to slow down would come into existence; we only say that under all the circumstances here existing, it did not arise. If the speed had been 20 miles an hour, as in the Kentucky case cited (Chesapeake Ry. v. Ryan, 183 Ky. 428, 209 S. W. 538), the result might very well have been different. Since the universality of automobiles, an appreciation of speed, and of the difference between 10 miles and 20 miles, and of the fact that it is usually not difficult for an active man to dismount safely from the low-hanging step of a vehicle at the 10-mile speed, has come to be common knowledge.

For cases with considerable analogy, where it has been held that the trainmen's conduct did not make out wanton negligence, see Bolin v. Chicago R. R., 108 Wis. 333, 84 N. W. 446, 81 Am. St. Rep. 911; Powell v. Erie R. Co., 70 N. J. Law, 290 (by Pitney, J.—a coal throwing case—see cases cited page 293) 58 Atl. 930, 1 Ann. Cas. 774; Pittsburgh R. R. v. Redding, 140 Ind. 101, 39 N. E. 921, 34 L. R. A. 767; Johnson v. Chicago Ry. (C. C.; Shiras, D. J.) 94 Fed. 473.

The judgment must be reversed, and the case remanded for a new trial.