## BROWN v. BALTIMORE & O. R. CO.
### No. 4166.

District Court, N. D. Ohio, W. D.
May 3, 1938.

Deeds & Cole, of Toledo, Ohio, for plaintiff.

Tyler, Wilson & Rhinefort, of Toledo, Ohio, for defendant.

KLOEB, District Judge.

This case grows out of an injury suffered by the plaintiff, George Brown, about 2:30 o'clock in the morning of April 13, 1935, at the station of the Baltimore & Ohio Railroad Company in Wapakoneta, Ohio, an injury that resulted in plaintiff losing both his legs.

Plaintiff had boarded the train at Dayton, Ohio, as the train was leaving the yards, and he was riding "blind baggage," as a trespasser, between the tender and the first car. At various times, in reviewing the incident after it had happened, it appears that the plaintiff stated that he was accompanied by certain other trespassers who were riding with him, sometimes numbered as a colored man and a white man, and at other times as three white men, who were also riding "blind baggage." At the trial of the case, under oath, he testified that he was riding alone.

The train was a passenger train, consisting of an engine and tender, three baggage and express cars, a combination car, and four sleepers, in the order named. The first car, a baggage car, was a sealed car, unoccupied, sealed and chained on the inside at Cincinnati, to be opened at Toledo.

Plaintiff is his sole witness in establishing his case, save for the testimony of one Jacob Ritchie, who claims to have seen some of the happenings from the main street of Wapakoneta. The essential facts, however, necessary and needful for the establishment of plaintiff's case, are relied upon through the testimony of plaintiff himself.

For the purposes of the determination of this motion, the court desires to look upon those portions of plaintiff's testimony essential in making his case from the standpoint most favorable to plaintiff. Briefly, they are as follows: When he arrived at Wapakoneta he dismounted from the train at the head of the first car, and immediately behind the tender, as the engine stopped to take on water at the north water plug, which was located north of, and east, across the main track from the station; the main track ran north and south through Wapakoneta; the station was on the west side, facing the east, and a brick platform extended from Auglaize street, which street ran east and west adjacent to the south side of the station, across the front of the station, and down approximately 100 to 120 feet beyond the north water plug. Plaintiff contends that, as the train came to a stop, he dismounted from the west side thereof, and ran down the platform, across the front of the station, and across Auglaize street, to a restaurant, for the purpose of getting something to eat; that, while there, the train whistled to start out, whereupon he ran back across the front of the station, down the platform to the rear of the tender, and the front end of the baggage car, where he swung on the handholds; that a uniformed man, whom he believed to be the conductor, stood in the doorway of the baggage car, and kicked first his right hand, with which he was holding to the vertical handhold on the baggage car, and then kicked his left hand, with which he was holding onto the vertical handhold at the rear of the tender, forcing him to release his hold, and that he fell back between the platform and the train, and his legs extended across the west rail of the main track and were cut off; that the train was moving 20 or 25 miles per hour when this occurred; that the engine had not yet cleared the platform that extended beyond the north water plug, and he further states that "when the men picked him up he was lying where he fell, and that he had not moved any." (Page 81.)

The uncontradicted testimony of numerous witnesses, six in all, was to the effect that he was found east of the east rail of the main track and at a distance variously estimated at between 28 and 40 feet north of the north water plug; that particles of flesh and blood were found some 18 feet north of the north water plug on the east rail of the main track is testified to by several witnesses. This also is uncontradicted.

A motion to direct a verdict at the close of plaintiff's case was made by defendant, and decision reserved by the court. (Page 179.)

At the close of all the evidence, the defendant moved for a directed verdict. The court reserved decision on the motion by authority of Baltimore & Carolina Line, Inc., v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636. The defense requested the court to pass on the motion, and took exception to the court's refusal. (Page 416.)

After argument of counsel and the charge of the court, and before the jury retired for their deliberation, the defendant requested the court to pass upon the motion for directed verdict; to which the court refused; to which the defendant excepted. (Page 425.)

After the discharge of the jury, following their failure to agree, counsel for defendant requested the court to rule upon its motions for a directed verdict, which the court declined to do. Thereupon the court directed counsel for defendant to file a brief thereon, to all of which defendant excepted. (Page 427.)

After further argument, it was then agreed that counsel on both sides would have ample time to file briefs, and the court would then rule. Before this was accomplished, the presiding judge, the honorable George P. Hahn, passed away. The motion is now submitted on briefs, and after argument.

### Opinion.

■ The court has in mind the general rule, when passing upon a defense motion for a directed verdict, to look upon the plaintiff's testimony from its most favorable light.

■ The court also has in mind the general rule of liability as to trespassers upon railroad trains, as set forth in 72 A.L.R., p. 538, which reads as follows:

"Rule of Liability. Generally.

"While railroad companies, by their duly authorized agents and servants, may lawfully remove trespassers from their trains, such a removal must be made with reasonable and ordinary care, under the circumstances of the case, so as not to injure unnecessarily the person removed. Accordingly, a railroad company will be held liable for injuries sustained by a trespasser ejected from its train by its servants, where such servants acted within the scope of their employment and in the line of their duty, if the expulsion was accomplished with excessive force or violence, or at such time or in such manner as to imperil unreasonably the trespasser's life or limb."

The court also has in mind the rules laid down in Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720, wherein the following principles of law are enunciated, paragraph 5 of syllabus: "Where the evidence upon any issue is all on one side, or so overwhelmingly on one side as to leave no room to doubt what the fact is, the court should give a peremptory instruction to the jury."

And at page 91 of 281 U.S., 50 S.Ct. 231, 233, 74 L.Ed. 720: "When, on the trial of the issues of fact in an action at law before a Federal court and a jury, the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party"—citing Slocum v. New York Life Ins. Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, Ann.Cas. 1914D, 1029.

The court also has in mind the case of Begert v. Payne, 6 Cir., 274 F. 784, paragraph 1 of syllabus: "On a motion by defendant for an instructed verdict, it is the duty of the trial judge to give plaintiff the benefit of every fair inference which might reasonably be drawn by the jury from the evidence, guided only by sound processes of reasoning and applicable principles of law."

Also paragraph 3 of syllabus: "Where plaintiff produces material evidence sufficient, if believed and uncontradicted, to warrant a verdict, no amount of contradictory evidence will authorize the trial judge to take the question of its effect and weight from the jury; the testimony not being

contrary to reason or to natural and physical laws."

The court also has in mind the case of Hickey v. Missouri Pacific R. R. Co. in Nebraska, 8 Cir., 8 F.2d 128, paragraph 3 of syllabus: "Plaintiff, though entitled on defendant's motion for directed verdict to have evidence taken most favorably to him, is not entitled to have credence given to testimony which conflicts with plain physical facts."

And on page 131 of the opinion of Circuit Judge Booth, in 8 F.2d, the following: "It must be conceded that, on the motion by defendant for a directed verdict, plaintiff was entitled to have taken in his behalf the most favorable view of the testimony. He was not entitled, however, to have credence given to testimony if it conflicted with plain physical facts. His claim that he looked at a certain point, and that no train was in sight, will not be given credence if the mathematical facts in the testimony given in his own behalf demonstrate the unsoundness of his claim."

The court also has in mind the case of Grand Trunk Western Ry. Co. v. Holstein, 6 Cir., 67 F.2d 780, at page 783, by Circuit Judge Hickenlooper:

"The statements of the plaintiff at the time, and on the scene, of his injury practically destroy the credibility of his later story upon the witness stand. This is especially true where the earlier story is consistent, and the later one wholly inconsistent, with the physical facts so far as proved. * * * Then, too, the plaintiff's failure to tell his present strange story at the time of, or immediately following, his accident is quite as eloquent as the statements actually made. * * *

"All things considered, we regard his story upon the witness stand as simply incredible. * * * Lastly, we think that this was a proper case for application of the doctrine that a verdict should be directed for defendant whenever the evidence is such that if a verdict were returned for the plaintiff the court should, in the exercise of a sound discretion, set it aside."

The court also has in mind the case of Gulf, Mobile & Northern R. R. Co. v. W. F. Wells, 275 U.S. 455, 48 S.Ct. 151, 72 L.Ed. 370, at page 372, the following (page 153): "In short, we find that on the evidence and all the inferences which the jury might reasonably draw therefrom, taken

156

most strongly against the Railway. Company, the contention that the injury was caused by the negligence of the engineer is without any substantial support."

This "substantial support" theory is propounded also in Strider v. Pennsylvania Ry., 6 Cir., 60 F.2d 237 and American Oil Co. v. Frederick, 6 Cir., 47 F.2d 54.

■ Finally, the court has in mind the case of Cincinnati, N. O. & T. P. Ry. Co. v. Lovett, 6 Cir., 272 F. 421, paragraph 1 of syllabus: "A carrier is liable to a trespasser on its freight train only in case the acts of the train crew in forcing him off should be classified as willful or wanton, or were characterized by recklessness or indifference to his injury in a degree equivalent to wantonness."

Paragraph 2 of syllabus: "In an action for the death of a trespasser, who fell under a freight train while the crew was attempting to eject him, evidence that the train was moving only 10 miles an hour, at which speed men frequently mounted or dismounted, held to entitle defendant to a directed verdict on the ground it did not warrant an inference of willful or wanton injury."

And at page 423 in the opinion of Circuit Judge Denison, in 272 F., the following: "When Campbell jumped off, it had gone some 300 feet, as he, as plaintiff's witness, states. Obviously, it could not have attained much speed; the evidence indicates perhaps 5 miles an hour, but Campbell estimates it as 'about 10 miles.' We must therefore assume the speed to be something approaching, but not exceeding, that figure. There is nothing to indicate ·that there was, at that point, any bridge, culvert, fill, or abnormal roughness in the grading alongside the tracks. * * * Just before Hamblin stepped or fell off, he was standing in the stirrup at the rear end, or perhaps straddling the sills of the two cars. For a man, standing there, to step around the corner of the car to the side stirrup, and then jump. or step to the ground, or to mount the car by the reverse motions, either one while the car is in motion is a thing commonly done by the trainmen, or by any men in the habit of getting on and off while the train· is in motion. The class of riders to which Hamblin appeared ·to belong, is in the habit of getting on or off trains in motion under these conditions, and the trainman had a right to assume that Hamblin belonged to this class, and would, ordinarily, be capable of dismounting from his position to the ground without injury while the train was moving."

And at page 424 of 272 F.: "We do not fix any limit of speed at which the duty to slow down would come into existence; we only say that under all the circumstances here existing, it did not arise. If the speed had been 20 miles an hour, as in the Kentucky case cited, * * * the result might very well have been different. Since the universality of automobiles, an appreciation of speed, and of the difference between 10 miles and 20 miles, and of the fact that it is usually not difficult for an active man to dismount safely from the low-hanging step of a vehicle at the 10-mile speed, has come to be common knowledge."

Let us review briefly the highlights of the testimony of the principal witnesses, and particularly that of the plaintiff, George Brown.

■ Jacob Ritchie, plaintiff's witness, claims to have driven east on Auglaize street in an automobile, and being barred by defendant's sleeping cars extending across the street, he stopped, about 50 feet west thereof, and from. thence claims to have seen the plaintiff run from the restaurant across Auglaize street in front of his automobile, and down the platform, as the engine whistled, to the tender and there, between four and five hundred feet away, at 2:30 o'clock in the morning, he states that he saw a foot extend out from the front end of the first car and step on plaintiff's hand. Significant is the following: "The train had just started" (page 23), "and about a length and a half of a coach, about eighty feet, of the train had passed in front of me" (page 34).

At page 39 a stipulation that the train consisted of an engine, a tender, and eight cars.

George Brown "boarded train at Dayton to Toledo—rode on tender. (Page 54.) Train moving—not very fast when I got on, at Wapak, but it was moving. (Pages 57 and 93.) Fell on back against platform. (Page 58.) Train going twenty or twenty-five miles per hour. (Page 66.) Quite a bit of experience riding passenger trains blind baggage. (Page 69.) Can get on and off them going fifteen miles per hour. (Page 71.) Nobody else bumming. (Page 71.) Not going very fast when I caught up with it. It was just easing away. I fell between the platform and rail on west side. The car had not yet left the platform. (Page

79.) I was not to the north end of the platform. (Pages 80, 87 and 95.) When the men picked me up I was lying where I fell. I had not moved any. (Page 81.)"

Witness J. H. Myer, for plaintiff—civil engineer. "Platform is 500 feet in length. (Page 159.) About one hundred and fifteen or one hundred and twenty feet from north water plug to north end of platform. North water plug is three hundred and ninety-one feet from the north curb of Auglaize Street. (Page 166.) The railroad track goes upgrade from the station to the north end of Wapak, a difference in elevation of 1.7 feet on the railroad on the one hundred foot stretch contiguous to the platform. (Page 171.)"

For the defense, the following witnesses:

George Kelly—station agent. "Train came in between 2:30 and 3:00 A. M. (Page 189.) Nobody ran by on the platform. (Page 192.) I heard him holler. I went down the platform and saw him on the east side of the main track. He was about twenty-eight feet north of the north water plug. (Page 194.) He was about five or six feet from the east rail. (Pages 195 and 197.) When the ambulance came he was in the same position on the ground. (Page 198.)"

Witness Cyrus Metzger—night patrolman. "Saw no person running on platform. (Page 207.) No automobiles were on the west side of the train in Auglaize Street. (Page 208.) Train extended beyond the crossing, eight cars on train. (Page 209.) It took water there between three and five minutes. (Page 209.) He (plaintiff) was lying twenty-eight or thirty feet north of north water plug where they took water that night. (Page 213.) He was lying on the east side of the east rail. There was flesh on the rail eighteen or twenty feet north of the water plug. The east rail. (Page 214.)"

Witness John Krieger—policeman. "He was lying twenty or thirty feet from the north water plug. (Page 228.) Lying on the east side of the main line about four or six feet from the track. (Page 229.) There were no automobiles at the crossing. (Page 230.) Saw no colored man run on the platform. (Page 231.) The engine stopped at the north water plug. (Page 235.)"

Witness Michael O. Heinl—undertaker. "He was lying east of the east rail. His feet were three or four feet away from the east rail. (Page 239.) He was thirty or forty feet north of the north water plug. He was lying on the driveway east of the main track up which I drove my ambulance. (Page 240.) It was very dark there. We had to use our spotlight to see to load him. The weather was a little foggy. (Page 241.)"

Witness C. J. Heinl—undertaker's assistant. "He was lying approximately twenty-five or thirty feet north of the north water plug. (Page 247.) East of the main track four or five feet. (Page 248.) He said he slipped and fell under. Also said one of the other men riding pushed him off. (Page 250.)"

Witness Orville Clum—lives adjacent to railway station. "His feet were about five feet from the track, and about twenty or twenty-five feet north from the north water plug. (Page 255.) Weather cloudy. (Page 256.) He was lying on the east side of the rails. (Page 257.)"

Witness Charles W. Foster—express messenger on second car. "The first car was No. 1515. Was a sealed car, doors fastened on inside and chained and sealed on inside from Cincinnati to Toledo. (Page 261.) Nobody was in that car. (Page 262.) No one came through the second car in which I was working at Wapakoneta. (Page 276.)"

Witness Carl Schwartz—superintendent, Auglaize County Home. "He said he was bumming a ride and a jolt of the train caused him to fall. (Page 283.)"

Witness George H. Sheipline—Auglaize county commissioner. "He said the train went over something rough and he slipped off. (Page 297.)"

Witness Harvey Elvey McDonald—Baltimore & Ohio track employee. "Saw particles of flesh and blood between eighteen and twenty feet north of north water plug on east rail of main track. (Page 306.)"

Witness Alvin Nungesser—Baltimore & Ohio water station employee. "Saw blood and flesh on east rail eighteen feet from water spout. (Page 308.)"

Witness James D. Poling—M.D. who performed the operation at Memorial Hospital, Lima. "He said he was pushed off by some other parties. (Page 340.)"

Witness Clifton Kilgore—fireman on engine. "We took water at the north water plug. (Page 343.) The track is upgrade;

going north from Wapak the platform runs about one hundred feet north of the north water plug along the west side of the main track. The train could not possibly be going more than four miles per hour at the end of the platform. (Page 347.)"

Witness Max D. Neal—druggist, Wapakoneta. "He said his foot slipped and he fell under. (Page 350.)"

Witness Charles C. Berlin, M.D. (Plaintiff's witness put on out of order.) "He said he was riding with other hoboes.. They had been drinking. He either fell off or was pushed off. (Page 354.)"

Witness James F. Irey—engineer of train. "There are one hundred feet of platform north of the north water plug. (Page 356.) It is very much upgrade out of Wapak for over a mile. Would not be going over two and a half to three miles per hour to the north end of the platform. This would mean about five revolutions of the drive wheel of the engine. One revolution of the drive wheel drives the engine about twenty feet. (Page 357.)"

Witness Riley Horn—copatient in Memorial Hospital, Lima. "Lying in hospital with Brown. He said he started to get on train and it bumped, causing him to lose his hold and fall. (Page 372.)"

Witness E. F. Heffner, M.D. "He said he caught hold to get on and slipped and fell and got his legs caught under the train. (Page 378.)"

Witness W. C. Demoss—inmate Auglaize County Home. "He said there was a sudden bump that caused him to lose his hold and he fell. He told me he lay there on the ground. (Page 381.)"

Witness Solomon J. Reed—copatient. "He said as he was climbing between the tender and the baggage car the wheels of the car struck a switch and jostled him off. (Page 387.)"

The court recognizes that the plaintiff is the only eyewitness to testify as to the immediate facts surrounding his injury. If there were two or three cotrespassers riding the train, as plaintiff repeatedly stated after his injury, and before the trial, then they do not appear at the trial. There is no direct oral contradiction to plaintiff's assertions made at the trial that he sought to board the train on the left, or west side, thereof, or that he was forced off at a time when the train was going 20 or 25 miles per hour. Many of his statements made after the happening, and before the trial, to various witnesses, are directly to the contrary.

For the purpose of the determination of this motion, the court will assume that his hands were kicked by an employee of the defendant company in order to force him to release the hold of his right hand from the handbar on the first car, and his left hand from the handbar on the tender, while he had his feet in the stirrups. The court assumes this, despite the fact that the door leading into this car, from its front end, was sealed and chained on the inside and the car was unoccupied from Cincinnati to its destination at Toledo.

Ordinarily, the court, in the consideration of a defense motion to direct a verdict, would view this testimony in a light most favorable to plaintiff, and would give plaintiff the benefit of every fair inference, which might reasonably be drawn by the jury from the evidence. Begert v. Payne, 6 Cir., 274 F. 784, supra. Here, however, the physical facts are directly in conflict with the testimony of plaintiff (Begert v. Payne, supra), and are completely reconciled with statements attributed to him shortly after the happening by numerous witnesses as to how his injury occurred. Grand Trunk Western Ry. v. Holstein, supra.

The particular physical fact that the court cannot reconcile, under any circumstance, with plaintiff's testimony, is his statement that at the time that he was forced from the train it was moving at a speed of 20 to 25 miles per hour. By his own testimony he caught hold of the train when it was barely moving. It was just getting under way. There is no dispute it was starting from a dead standstill after the engine had taken water. It was located on an upgrade, and it was drawing eight express and passenger cars. Plaintiff's own statement is that he lay where he fell, and that he fell before the tender had cleared the brick platform that extended along the west side of the main track from in front of the station, north to a point about 100 to 120 feet north of where the water plug was located. Thus, by his own testimony, after the train had started it could not have proceeded at most more than 120 feet. His own witness, Ritchie, testified that he could see from his automobile in Auglaize street, north past the station, to a point almost 500 feet from where he, Ritchie, was sitting on a night when the weather was foggy, at 2:30 o'clock at night, and could see the plaintiff have his fingers

trampled on, and fall from the train—yet this same witness stated that, at the time that this happened, about 80 feet of the train had passed in front of him from the time it had started.

The fireman and the engineer of this train state that, under all the circumstances, the train could not possibly have attained a speed of more than 2½ to 4 miles per hour from the time that it left the water plug until the engine had cleared the extreme north end of the platform. One revolution of the drive wheel propelled the engine approximately 20 feet. The physical facts are that the plaintiff, as he said, lay where he fell. After the train cleared the station his cries were heard by the station master, Kelly. He immediately ran to him, and was followed by two patrolmen and a neighbor, Clum. Kelly found him about 28 feet north of the north water plug, 4 or 5 feet east of the east rail. He testifies that Brown did not move after he found him. The ambulance then arrived. The two patrolmen, Clum, Kelly, and the two Heinls, who accompanied the ambulance, all testify that he lay from 28 to 40 feet north of the north water plug, some 4 or 5 feet east of the east rail of the main line. Several other witnesses then say that they found flesh upon the rail, and blood, approximately 18 feet north of the north water plug on the east rail of the main line, which would be perhaps 8 or 10 feet directly south of where the plaintiff was found lying.

An engine, carrying eight heavy cars, pulling up a decided grade from a standing position, the grade extending for a mile out of the city, could not, under any concept of the imagination, have attained a speed of 20 or 25 miles an hour inside of a half mile from its starting point. The speed of the engine, after one or two revolutions of its drive wheel, which would propel it 20 to 40 feet from its starting point, might well be calculated to be in the neighborhood of one-half mile per hour. In the parlance of seagoing men, the train barely had steerageway.

Applying the principles of the Lovett Case, and, assuming that the plaintiff was kicked off by one of defendant's agents, it could not have been such reckless and wanton misconduct, and disregard of human life and limb, as to authorize a recovery for the plaintiff, skilled, by his own testimony, in mounting and dismounting trains. Plaintiff is not entitled to have credence given to testimony which conflicts with the plain physical facts. Hickey v. Missouri Pacific R. R., supra. The statements of the plaintiff at the time of, and following, his injury, practically destroy the credibility of his later story upon the witness stand. This is especially true where the earlier story is consistent, and the later one wholly inconsistent with the physical facts so far proved. Plaintiff's failure to tell his present story at the time of, or immediately following, his accident, is quite as eloquent as the statements actually made. All things considered, his story upon the witness stand is simply incredible. Grand Trunk Western Ry. Co. v. Holstein, supra.

In the opinion of this court, no court ought to be obliged to follow a general rule in the consideration of a motion for a directed verdict, when, by following such general rule, he would shock his own conscience by flying in the face of plain physical facts.

Motion sustained.